~~James A. Hunter~~
~~S.D.N.Y. Bar No. JH-1910~~
~~LAW OFFICE OF JAMES A. HUNTER~~
~~201 King of Prussia Road, Suite 650~~
~~Radnor, Pennsylvania 19087~~
~~Phone: +1 (484) 275-2162~~
~~Fax: +1 (646) 462-3356~~
~~Email: hunter@hunterkmiec.com~~

~~*Counsel for Plaintiff 20230930-DK-Butterfly-1, Inc., f/k/a Bed Bath & Beyond Inc.*~~

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| 20230930-DK-BUTTERFLY-1, INC., f/k/a BED BATH & BEYOND INC., | ECF CASE |
| Plaintiff, | No. 24-cv-5874 (NRB) |
| – v. – | ~~COMPLAINT FOR RECOVERY OF "SHORT-SWING" PROFIT UNDER 15 U.S.C. § 78p(b)~~ |
| RYAN COHEN and RC VENTURES LLC, | **FIRST AMENDED COMPLAINT** |
| Defendants. | **JURY DEMAND** |

Plaintiff 20230930-DK-Butterfly-1, Inc., f/k/a Bed Bath & Beyond Inc. ("BBBY"), by its undersigned counsel, pleads for its ~~complaint~~First Amended Complaint as follows:

**INTRODUCTION**

1. This is an action to recover more than $47 million in profit realized in violation of Section 16(b) of the Securities Exchange Act of 1934, as amended (the "Act"), 15 U.S.C. § 78p(b).

2. Section 16(b) was enacted "[f]or the purpose of preventing the

unfair use of information which may have been obtained by [an insider] by reason of his relationship to the issuer."  15 U.S.C. § 78p(b).

3.      The statute applies to every director or officer of an issuer with a class of equity securities registered under Section 12 of the Act.  *Id.* § 78p(a).  It also applies to every "beneficial owner" of more than 10% of any such class.  *Id.*

4.      Under Section 16(b), these statutory insiders must return to the issuer any profit realized on any purchase and sale, or sale and purchase, of the issuer's equity securities within any period of less than six months.  *Id.* § 78p(b).  If an insider fails to return this "short-swing" profit, the issuer may bring suit to recover it.  *Id.*

5.      Liability under Section 16(b) is strict.  The issuer has the right to recover the profit from a short-swing transaction "irrespective of any intention on the part of [the insider] . . . in entering into such transaction."  *Id.*  Recovery never depends on proof of scienter, a breach of duty, or the actual misuse of inside information.  *See Reliance Elec. Co. v. Emerson Elec. Co.*, 404 U.S. 418, 422 (1972).

6.      Plaintiff BBBY, the issuer formerly known as Bed Bath & Beyond Inc., brings this action under Section 16(b) against two erstwhile investors: Defendants Ryan Cohen ("Cohen") and RC Ventures LLC ("RC Ventures" and, collectively with Cohen, the "Cohen Defendants").

7.      The Cohen Defendants made dozens of purchases and sales of BBBY's equity securities between January and August 2022, all of them profitable and most within a single period of less than six months.  At the time the profit was realized in August 2022, the Cohen Defendants were acting as BBBY's statutory directors, entitling BBBY to recovery of the short-swing profit under the plain text of Section 16(b).  BBBY

is entitled to recover a portion of the short-swing profit for the additional reason that the Cohen Defendants beneficially owned more than 10% of BBBY's outstanding common stock when some of the purchases and sales were made.

8. From their purchases and sales of BBBY's equity securities within a period of less than six months, the Cohen Defendants realized a total profit of more than $47 million. Under Section 16(b) of the Act, that profit is the lawful property of BBBY, which the Cohen Defendants are strictly liable to account for and repay.

## JURISDICTION AND VENUE

9. Jurisdiction is conferred on this Court by Section 27 of the Act, 15 U.S.C. § 78aa, and by 28 U.S.C. § 1331.

10. Venue lies in this District under Section 27 of the Act and under 28 U.S.C. § 1391(b)(2) because (a) the transactions listed in paragraphs ~~151~~163-~~160~~172 below were executed through brokers and market makers located in this District, including the Cohen Defendants' securities broker, J.P. Morgan Securities LLC, based in midtown Manhattan; and (b) the stock transactions listed in paragraphs ~~151~~163-~~160~~172 below were executed through the facilities of The Nasdaq Stock Market LLC, a national securities exchange registered under Section 6 of the Act, 15 U.S.C. § 78f, and located in this District.

## THE PARTIES

11. Plaintiff BBBY is a corporation formed under the law of the State of New York, with a principal place of business formerly located in Union, New Jersey. BBBY was known as "Bed Bath & Beyond Inc." at all relevant times until September 21, 2023, when it changed its name to "20230930-DK-Butterfly-1, Inc." as part of its wind-down following Chapter 11 bankruptcy. At all relevant times, BBBY's common stock

was registered under Section 12(b) of the Act, 15 U.S.C. § 78*l*(b), and was listed for trading on the Nasdaq Global Select Market.

12. Defendant Ryan Cohen is a natural person, a citizen of Canada, and a resident of the State of Florida. Through his personal investment vehicle RC Ventures, Cohen exercised voting and investment power over all of the BBBY securities beneficially owned by RC Ventures as described herein.

13. Defendant RC Ventures LLC is a limited liability company formed under the law of the State of Delaware with a principal place of business located in the State of Florida. Cohen owned and controlled RC Ventures at all relevant times, serving as its sole manager and using it as a holding company to invest his personal fortune. At Cohen's direction, RC Ventures directly purchased, sold, and held all of the BBBY equity securities in which the Cohen Defendants transacted as described herein.

## THE FACTS

## I. THE INSIDERS

### A. The Cohen Defendants' Investment in BBBY

14. The Cohen Defendants made their first investment in BBBY in January 2022.

15. Through steady open-market purchases of BBBY common stock and call options, the Cohen Defendants had acquired beneficial ownership of 9,450,100 BBBY shares by March of that year.

16. On March 7, 2022, the Cohen Defendants publicly disclosed their position by filing a statement of beneficial ownership on Schedule 13D with the SEC.

17. The Cohen Defendants would amend that statement twice before filing a third and final amendment in August 2022 upon the profitable exit of their investment.

18. Copies of the Cohen Defendants' original and amended statements on Schedule 13D are attached as Exhibits A-D to this ~~complaint~~First Amended Complaint.

19. The original Schedule 13D filed on March 7 included as an exhibit a copy of a letter of March 6 that Ryan Cohen had sent to the BBBY board.

20. Cohen's letter criticized the strategy and execution of BBBY's management, observing that BBBY's stock had underperformed its benchmark "across every relevant time horizon." Ex. A ex. 99.1 at 1.

21. The letter then offered four "suggestions" for righting the ship: (1) focus on a "core set of objectives," such as "front-loading the modernization of [BBBY's] supply chain and technology stack"; (2) sell or spin off BBBY's subsidiary, buybuy Baby, Inc., which the Cohen Defendants viewed as the company's crown jewel and a significant source of trapped value; (3) as an alternative to selling buybuy Baby, evaluate the possibility of selling BBBY intact to a "well-capitalized financial sponsor[]"; and (4) improve executive compensation to "strengthen leadership's alignment with shareholders." *Id.* at 2-4.

22. The letter closed by urging management to "act[] with urgency to implement the aforementioned suggestions," warning that RC Ventures would "hold the Board and management accountable if necessary." *Id.* at 4.

23.     Cohen's letter got results.  On March 25, 2022, BBBY announced that it had entered into an agreement with the Cohen Defendants (the "Cooperation Agreement") to add three new members to its board.  Ex. B ex. 99.1.

24.     The Cooperation Agreement required BBBY to expand its 11-member board to 14 seats and fill the three vacancies with the following persons handpicked by Cohen: Marjorie L. Bowen, Shelly C. Lombard, and Benjamin Rosenzweig (collectively, the "Cohen Appointees").  *Id.* § 1(a)(i).

25.     The agreement also obligated BBBY to appoint directors Bowen and Rosenzweig to a four-member Strategy Committee formed "with an agreed upon charter to support the Board's oversight and review of a strategic analysis of the buybuy BABY business."  *Id.* § 1(b)(i).

26.     BBBY also agreed to nominate and support the Cohen Appointees for election to full one-year terms as directors at the company's next annual meeting in July 2022.  *See id.* § 1(a)(i)(B).

27.     If one of the Cohen Appointees resigned or otherwise ceased to serve as a director during the agreement's term, the Cooperation Agreement gave the Cohen Defendants the right to fill the vacancy with a reasonably acceptable replacement.  *See id.* 1(a)(ii).

28.     In return for these significant benefits, the Cohen Defendants agreed to a yearlong standstill that barred them from, among other things, waging a proxy contest or owning more than 19.9% of BBBY's common stock.  *See id.* § 2(a).

29.     The Cooperation Agreement also generally obligated the Cohen Defendants to vote their BBBY shares during the standstill in favor of the board's director nominees and otherwise as directed by the board.  *Id.* § 1(e)(iii).

30.     Unlike most agreements of its kind, the Cooperation Agreement did not obligate the Cohen Defendants to maintain the confidentiality of any nonpublic information they obtained from BBBY.  It also did not restrict the Cohen Defendants' use of that information.

31.     The Cohen Defendants (whom the Cooperation Agreement referred to collectively as "RC Ventures") were required only to "acknowledge[]" that the U.S. securities laws "may" prohibit insider trading.  *See id.* § 1(f) ("Acknowledgement. RC Ventures acknowledges that it and its Affiliates and Associates are aware that the United States securities laws may prohibit any person who has received from an issuer material, nonpublic information from purchasing or selling securities of such issuer or from communicating such information to any other person under circumstances in which it is reasonably foreseeable that such person is likely to purchase or sell such securities.").

32.     The Cohen Appointees officially joined BBBY's board with the signing of the Cooperation Agreement on March 24, 2022.  Bowen and Rosenzweig officially joined the Strategy Committee the same day.

33.     The Cohen Appointees would remain on BBBY's board for the duration of the Cohen Defendants' investment in BBBY.

**B.     The Cohen Defendants as Statutory Directors**

34.     The Act defines a "director" as "any director of a corporation or any person performing similar functions."  15 U.S.C. § 78c(a)(7).

35.     As the phrase "or any person performing similar functions" makes clear, the term "director" is not limited to the persons who formally hold that title.  The term extends as well to any person who "functions" as a director, as through a "deputy" on the issuer's board.  *Blau v. Lehman*, 368 U.S. 403, 409 (1962).  Since the Act includes many entities and institutions under the umbrella of "person," *see* 15 U.S.C. § 78c(a)(9), it is not even necessary that the "person" who "functions" as a "director" be a flesh-and-blood human.  *See Lehman*, 368 U.S. at 409.

36.     Rather, a person or entity will qualify as a director under Section 16(b) if the person or entity "function[s] as a director" through a board deputy, who "perform[s] a director's duties not for himself but for [the deputizing party]." *Id.* at 410.

37.     The Cohen Defendants were statutory directors of BBBY for purposes of Section 16(b) because they deputized the Cohen Appointees to serve as their representatives on BBBY's board.  As alleged in the following paragraphs, the Cohen Appointees performed their duties as directors for the benefit of the Cohen Defendants. They secured the Cohen Defendants access to and influence over BBBY's management, and through the Cohen Appointees the Cohen Defendants received significant material nonpublic information about BBBY.

**1.     The Cohen Appointees Represented the Cohen Defendants on BBBY's Board**

38.     From the very beginning of his engagement with BBBY, Cohen made clear that he intended to be a hands-on partner.  In a March 12 email to board chair Harriet Edelman, shortly before the Cooperation Agreement was memorialized, Cohen wrote that he "look[ed] forward to being a partner to [then-CEO] Mark [Tritton] and a

refreshed board/new committee." He even urged BBBY's management to issue a public statement that the board was "serious about collaborating" with him. In her March 16 response to Cohen, Edelman predicted that the Cooperation Agreement would form a "strong foundation" for a "a long term, collaborative relationship."

~~38.~~39. Cohen did not personally join BBBY's board only because he lacked the time, having already assumed the chair of another public company, GameStop Corp. "Given that I am the Chairman of GameStop and overseeing a systematic transformation," his March 6 letter explained, "I am not in a position to join Bed Bath's Board and personally drive the initiatives outlined in this letter." Ex. A ex. 99.1 at 4.

~~39.~~40. Because Cohen could not "personally" drive his initiatives as a BBBY board member, he relied on his three directors to drive the initiatives for him, and the Cohen Appointees understood that they were serving on BBBY's board as representatives of the Cohen Defendants.

~~40.~~41. Cohen Appointee Ben Rosenzweig described this arrangement in unvarnished terms. At his very first meeting with BBBY's management in March 2022, Rosenzweig announced to the room, "I will be representing Ryan as if I owned the 10% myself."

~~41.~~42. Rosenzweig doubled down at a later meeting that same day, telling BBBY's management, "Ryan does not want to be on the board — [he] wants directors on as indirect proxy."

~~42.~~43. At least four members of BBBY's management — including ~~its then-CEO Mark~~ Tritton, ~~its~~ director ~~and next CEO~~ Sue Gove, ~~its~~ chief legal officer Arlene Hong, and director Ann Yerger — heard one or both of these remarks first-hand.

~~43.~~44. All three Cohen Appointees urged the board to give Cohen more influence and access.

~~44.~~45. Cohen Appointee Marjorie Bowen pressed BBBY's board to bring Cohen "under the tent" — i.e., to have him sign a nondisclosure agreement so he could have advance access to material nonpublic information about the company. The nonpublic information she wanted Cohen to access included unreleased earnings reports.

~~45.~~46. In a related case brought before another court, Rosenzweig admitted in sworn testimony that he asked board chair Harriet Edelman and then-CEO Mark Tritton "whether they would be willing to have a confidential discussion with Ryan Cohen." The purpose of the meeting would be to "[d]iscuss the state of the business, solicit [Cohen's] feedback, basically broaden and deepen the relationship with him."

~~46.~~47. Independent director Sue Gove, who would succeed Tritton as interim CEO, testified in that same case that Rosenzweig also wanted to get Cohen access to earnings releases and advance information on any sale or spinoff of buybuy Baby.

48. In a June 24 email to Gove, sent after she was tapped to replace Tritton as CEO, Rosenzweig urged her to "be more proactively working in partnership with Ryan in order to set the company (and you) up for success." Rosenzweig added that he "kn[e]w a few other directors (including [Cohen Appointees] Marjorie [Bowen] and Shelly [Lombard]) also feel that the company can greatly benefit from a deliberate plan of action surrounding the transition."

~~47.~~49. At her own deposition, Cohen Appointee Lombard testified that she approached Cohen in May ~~2021~~2022 to discuss getting him access to material nonpublic information about BBBY. She reached out to Cohen because "[t]here had

been some discussion on the board about [Cohen] getting restricted, so he could get non-public, material non-public information and assist with the turnaround of the company."

~~48.~~50. This "discussion" was driven entirely by the Cohen Appointees, as the rest of BBBY's board opposed giving Cohen access to nonpublic information.

~~49.~~51. Gove confirmed the schism at her deposition. She testified that directors Bowen, Lombard, and Rosenzweig were the only members of BBBY's board who supported giving Cohen access to material nonpublic information.

~~50.~~52. When asked "what would the company achieve if Cohen was given this information before other investors," Gove testified:

> A. None that I could think of.
>
> Q. Did they ever explain why they wanted to do this?
>
> A. No.
>
> Q. Did it make sense to you?
>
> A. No.
>
> Q. Did the company ever entertain a proposal like this for any other shareholder while you were at the company?
>
> A. No.
>
> Q. So, it was only Mr. Cohen?
>
> A. Right. . . .

~~51.~~53. The division between the Cohen Appointees and the rest of the board went beyond policy. It cut to the basics of the governance process. Acting more like a delegation than three independent fiduciaries, the Cohen Appointees caucused separately from the board, holding their own exclusive meetings by phone or text or in Internet chatrooms.

~~52.~~54. In one such chatroom caucus, Bowen referred to Cohen as "our beloved Ryan Cohen."

~~53.~~55. On another occasion, the three Cohen Appointees convened in a private chatroom while simultaneously attending a meeting of the board. Unbeknownst to their fellow directors, the three Cohen Appointees were conversing with one another through this back channel even as they participated in the board meeting. The private messages the Cohen Appointees exchanged during the meeting included commentary (e.g., "This is nuts"); planning (e.g., "We will go to Harriet after call."); advice (e.g., "Follow Ryan's playbook."); and encouragement (e.g., "Go Shelly go!!!").

~~54.~~56. The last messages from that chat session indicate that the Cohen Appointees also planned to hold a "wrap up call" among themselves after the board meeting concluded.

**2. The Cohen Appointees Secured the Cohen Defendants Access to Management and Material Nonpublic Information**

~~55.~~57. Despite the misgivings of the rest of the board, the Cohen Appointees prevailed in securing the Cohen Defendants significant access to material nonpublic information about BBBY.

~~56.~~58. Some of the confidential information the Cohen Defendants got came courtesy of the Cohen Appointees themselves.

~~57.~~59. Director Rosenzweig's phone records show that he and Cohen spoke by telephone on April 15, 2022, April 16, 2022, May 7, 2022, and May 8, 2022. The April 16 call lasted nearly 40 minutes, and the May 8 call lasted nearly 30 minutes.

~~58.~~60. In his sworn testimony, Rosenzweig admitted giving Cohen nonpublic information on these calls, though he downplayed the information's

materiality. Rosenzweig described his conversations with Cohen as "high-level observation[s]" about BBBY board dynamics. The two discussed whether board members "seemed, you know, friendly, whether they seemed open to new perspectives, whether we would be able to get along and there [sic] are collegial, things like that."

~~59.~~61. Director Lombard likewise met privately with Cohen to discuss BBBY in a May 2022 Zoom.

~~60.~~62. Beyond their direct communications with Cohen, the Cohen Appointees served as a gateway to the rest of BBBY's management, securing the Cohen Defendants access to significant material nonpublic information, including unreleased earnings data.

~~61.~~63. On the morning of June 29, 2022, BBBY announced its dismal earnings for the first quarter of fiscal year 2022. The announcement included the astonishing news that BBBY's quarterly sales had declined 25% year over year.

~~62.~~64. In a separate release issued just minutes earlier, BBBY also announced that it was replacing its CEO Mark Tritton with independent director Sue Gove, who would act as interim CEO until a permanent replacement was found.

~~63.~~65. The double whammy of the earnings miss and management shakeup shocked the market, which sent the stock tumbling more than 23% on June 29.

~~64.~~66. Cohen got the shock a day early because BBBY told him the news on June 28. A day before the public announcement, BBBY chair Harriet Edelman held a 45-minute Zoom meeting with Cohen on which she disclosed key earnings data and gave Cohen a heads-up about Tritton's termination.

~~65.~~67. Gove later testified that the board gave Cohen a sneak peek at this material news at the insistence of director Rosenzweig.

~~66.~~68. According to Gove, Rosenzweig especially wanted Cohen to be told of the CEO's replacement because Rosenzweig feared Cohen would feel "blindsided" if he had to learn from the media about a significant personnel decision in which his own directors had participated.

~~67.~~69. The Zoom between Cohen and Edelman ended up ranging far beyond the earnings release and personnel move. Edelman took contemporaneous notes on the call, which she emailed to the rest of BBBY's board.

~~68.~~70. A copy of Edelman's email is included in an email chain attached as Exhibit E to this ~~complaint~~First Amended Complaint.

~~69.~~71. According to Edelman's notes, Cohen asked multiple questions about BBBY's cash flow and liquidity. He wanted to know if BBBY was upsizing its revolving credit line; if it was considering selling shares; and how it planned to repay or refinance its senior unsecured notes due 2024. Ex. E at 2.

~~70.~~72. Cohen also asked about BBBY's inventory management and its private label (or "Owned Brands") strategy, as well as questions about CEO succession and finding a permanent replacement for Tritton. *Id.*

~~71.~~73. Finally, Cohen urged Edelman to be very aggressive about cutting overhead, insisting BBBY "can't cut enough." *Id.*

~~72.~~74. Cohen's June 28 Zoom with Edelman was not his only private exchange with BBBY's management. Aside from his communications with the Cohen Appointees, records show that Cohen communicated with BBBY directors or officers by

email, phone, or videoconference on at least April 7 and 27, June 22, 28, 29, and 30, and July 1, 15, 21, and 22.

~~73.~~75. Cohen was upfront about his expectations for information. In an April 27 email to Edelman, Cohen laid out a bulleted list of his "high-level thoughts" for improving the business. He solicited her views and also asked her to forward his email to the full board.

~~74.~~76. A copy of Cohen's April 27 email to Edelman is included as part of the email chain attached as Exhibit F to this ~~complaint~~First Amended Complaint.

~~75.~~77. Cohen closed his email with the following directive:

> Since we're under an agreement, there's mutual respect, and I'd like to hear your views via phone or email on these points. This is a partnership now and it shouldn't be a one-way conversation. We have to work together to get this business turned around as quickly as possible. I'm looking forward to collaborating with you often.

~~76.~~78. A repeated Cohen tactic in his exchanges with BBBY management was to forswear any interest in material nonpublic information right before asking for exactly that kind of information.

~~77.~~79. In an April 7 email to then-CEO Mark Tritton, Cohen asked to have a call "to catch up" and get a "'big picture' discussion" about the company, stressing that he wanted "nothing about the quarter or restricted information."

~~78.~~80. In the same paragraph, however, Cohen explained that he wanted to know how Tritton's "[enterprise] plan took shape, how we're tracking against it and what you see as the go-forward priorities or areas to course correct."

~~79.~~81. Because BBBY was then at an inflection point from recovery to decline, any information about how the business was "tracking" against plans, or needed "course correc[tion]," would have been important to investors.

~~80.~~82. The timing of Cohen's email was also significant, as he reached out to the CEO less than a week before BBBY was set to release its fourth-quarter and full-year earnings for fiscal year 2021. Any discussion of how the business was tracking against plans or needed course correction would undoubtedly reveal nonpublic information about how BBBY had performed over that most recently completed quarter.

~~81.~~83. Tritton deflected Cohen's offer by agreeing to speak with him but insisting they wait until after earnings. Deferring the call, Tritton explained, would let him "share more context on immediate performance and schedule to talk about our Enterprise plan creation, execution and trajectory."

~~82.~~84. When the call was finally held, Cohen continued his probe. BBBY's management contemporaneously prepared a rough transcript of the call, an excerpt of which is attached as Exhibit G to this ~~complaint~~First Amended Complaint.

~~83.~~85. The transcript shows that Cohen at one point asked, "How do you feel about the balance sheet? Is it safe to assume we're in for more operating losses?"

~~84.~~86. Tritton demurred: "Not at liberty to say at this point."

~~85.~~87. Cohen appeared to move on but moments later re-asked essentially the same question: "So how do you currently feel about the balance sheet?"

~~86.~~88. This time BBBY's CFO Gustavo Arnal jumped in with a fairly detailed response:

> A few things (already disclosed) — Q1 is expected to be a loss and expected by the market with EBITDA in wide ranges contemplated by the market; key on balance sheet is getting into sustainable operating cash flow generation with key on inventory management . . . similar narrative across many retailers . . . cash flow generation challenges given inventory purchases and mismatch. Balance sheet insurance is ABL ($1B) liquidity . . .

~~87.~~89. Although Arnal's remarks were qualified with "already disclosed," not all of the details he shared had previously been made public.

~~88.~~90. For example, the fact that management had come to view its asset-backed facility as "insurance" against insolvency was new and ominous information, and it drew an immediate reaction from Cohen:

> RC: Drawing down the ABL should only be done in a severe, catastrophic situation . . . feels like there are a lot of steps that could be taken to conserve cash besides drawing down on the ABL . . . cutting capex, reducing SG&A, turning inventory faster . . .

~~89.~~91. In a July 15 call with interim CEO Sue Gove after Tritton's ouster, Cohen continued to hunt for intel while disclaiming any such hunt. Gove's notes on the call describe Cohen as "focused on liquidity" and asking "deep dive questions around vendor support."

~~90.~~92. Gove corroborated these notes in her testimony:

> So, as I mentioned before, he, you know, prefaced all of this with, "I don't want any MNPI. I don't want any MNPI." You know, "Don't want that. Be careful." And then, he moved into questions on liquidity and specifically asked were the vendors providing support? Had I had conversations with the vendors? You know, how was that going? What was taking place?

~~91.~~93. While Cohen laundered his questions with the caveat that he wanted no material nonpublic information, the information he sought was nonpublic and highly material to an investment in BBBY at that time.

~~92.~~94. By 2022, BBBY had begun deferring payments to some vendors to conserve cash. These deferrals were risky because vendors might respond by halting deliveries of inventory, and enough vendor defections could tip the business into a tailspin. Inventory shortfalls meant unstocked shelves, which meant lost sales and lost

customers, leaving BBBY with even less cash to pay vendors and even deeper inventory shortfalls and steeper sales declines.

~~93.~~95. As a result, questions about "liquidity" and "vendor . . . support" were among the most material ones Cohen could have asked at this critical juncture in BBBY's turnaround.

~~94.~~96. Cohen also demanded advance knowledge of any dilutive stock offerings BBBY might do, even if he had to sign up a nondisclosure agreement to get it. Gove testified:

> A. He was very specific that he did not want anything that we were doing to be dilutive to shareholders, and that if there was anything that might, you know, that would have any potential of being dilutive to shareholders, he would want to be — he would be wanting to consider being brought into the tent at that point in time.
>
> Q. To get what, more information?
>
> A. To get information.

~~95.~~97. As a follow-up to the July 15 call, Edelman reached out to Cohen by email on July 21 and asked if she and Gove could come to meet with him in Florida.

~~96.~~98. Cohen emailed back that there was no need to meet in person because they could always confer by video or phone. He added, "Happy to do so before September if you'd like."

~~97.~~99. No further exchange occurred, because the Cohen Defendants dumped their entire BBBY position on the market just a few weeks later in mid-August.

~~98.~~100. Most of the Cohen Appointees did not stick around long after the Cohen Defendants liquidated their holdings. Rosenzweig left the board on

December 20, 2022, and Bowen followed him out on February 11, 2023. Neither director served the full term for which the Cohen Defendants had them appointed.

~~99.~~101. Only director Lombard stood for reelection at BBBY's 2023 annual meeting. She would remain a director until the board was disbanded in BBBY's bankruptcy.

**3. The Cohen Appointees Were Widely Viewed as Representatives of the Cohen Defendants**

~~100.~~102. The view that the Cohen Appointees were serving as the Cohen Defendants' representatives on BBBY's board — and as conduits of material nonpublic information for Cohen personally — was widely held both within and beyond the company.

~~101.~~103. An Agence France-Presse dispatch after the announcement of the March 2022 Cooperation Agreement referred to Rosenzweig, Bowen, and Lombard as Cohen's "representatives to the board of directors."

~~102.~~104. Wall Street Journal editor Spencer Jakab has likewise described Cohen's mission at BBBY as "push[ing] for changes and board representation."

105. An item published in the Financial Times on June 29, 2022 even reported (incorrectly) that the three Cohen Appointees were "members of Cohen's firm, RC Ventures."

~~103.~~106. CNBC host Jim Cramer had the most pointed take, which he offered in a segment on the morning of August 18, 2022, ~~when unconfirmed~~shortly after rumors of the Cohen Defendants' sales first made news. Cramer called it

"quizzical" that the Cohen Defendants would sell, considering that Cohen was "obviously in possession of material inside information [because] he has three people on the board."

104.107.    Later that day, after the Cohen Defendants' sales were publicly confirmed, Cramer took to the air again, repeating that Cohen was an "insider" because "he has three people on the board."  Addressing Cohen, Cramer asked, "did you really file to sell or sell stock when you had material nonpublic information?  Which you certainly had, because your people were on the board."

108.    GoveThe inference that the Cohen Defendants' sales were informed by material nonpublic information gained strength over the following weeks as rounds of bad news hit the market.  In just the two weeks between August 18 and September 1, the market learned that (1) suppliers had limited or stopped deliveries of inventory because BBBY wasn't paying them; (2) BBBY was laying off 20% of its workforce, closing 150 stores, and cutting capital expenditures by $150 million; (3) BBBY had shelved plans to sell or spin off buybuy Baby; (4) BBBY was launching a dilutive "at the market" offering to sell $12 million in stock at firesale prices; and (5) BBBY's credit rating had been downgraded.

109.    With the exception of the downgrade, BBBY's board had material nonpublic information about all of these events at the time of the Cohen Defendants' sales.  Work on the stock offering and the new buybuy Baby strategy had been ongoing since early August.  As previously alleged, Cohen was keen for advance information about dilution and the fate of buybuy Baby, and the latter fell within the remit of the Strategy Committee on which two Cohen Appointees sat.

110. Although the Cohen Defendants' sales were not publicly disclosed until August 18, rumors of the sales took flight on August 17 after RC Ventures made a regulatory filing announcing a "potential sale" of its investment. Publicly, BBBY's management brushed the rumors off. In an anodyne statement released on the afternoon of August 17 "in response to certain media inquiries," the company did no more than repeat old news that it was "pleased to have reached a constructive agreement with RC Ventures in March and are committed to maximizing value for all shareholders."

111. Privately, management was troubled by the possibility that the Cohen Defendants had unloaded their entire BBBY stake in such well-timed sales. The Cohen Appointees anticipated the public's reaction to the sales, and at least one of them lobbied BBBY's board to allay any suspicion of impropriety. In a message to Edelman ~~had the~~ on the evening of August 17, after BBBY's public statement had been released, Lombard suggested releasing a second statement exonerating Cohen of any wrongdoing:

> I know the statement has already gone out. But if we the [sic] opportunity, is it worth making it clear that RC is not on the board; is not privy to what we've been working on nor the company's recent results. He only has same info that's in the media. We look forward to updating the market on our progress.

112. Until this idea was floated, no one in BBBY's management had given any thought~~. They both~~ to doing damage control for Cohen. The Cohen Defendants had not even publicly confirmed their sales yet. Lombard's proposal to exculpate the Cohen Defendants came out of the blue.

113. Edelman nixed the proposal, paraphrasing her response to Lombard in a later email to BBBY's PR and investor relations personnel:

> I responded that it sounds like Shakespeare's "thou doth protest too much . . .". I asked whether there was a particular concern or signal she's received that prompts the question . . . he is not on the board,

explicitly stated when he invested he has no desire/intent to be on the board and the rest feels like we are responding before asked. I left it like that.

114. Gove, who was copied on Edelman's email, responded: "Agree. Not our concern to provide him a rep."

115. BBBY's reluctance to run interference for the Cohen Defendants owed to something more than corporate protocol, for Gove and Edelman had their own suspicions about the timing of the Cohen Defendants' sales.

~~105.~~116. Both Gove and Edelman had heard Cramer's August 18 commentary and exchanged text messages about it. In one of those exchanges, ~~Gove and Edelman~~they agreed that Cramer was asking "good questions" in wondering whether the Cohen Appointees might have given Cohen a "signal" to sell.

~~106.~~117. Gove was asked about this exchange at her deposition:

Q. Signaled what to him?

A. Signaled concerns to him.

Q. About the company?

A. Yeah.

Q. Like, sharing inside information?

A. Yeah.

Q. Right. So, you had concerns? And — and you — you had concerns about that?

A. As I — my response, "All good questions." I certainly had questions about that.

~~107.~~118. Gove testified that she lost trust in Cohen because "[t]here was a lot of things that had taken place between, you know, him and Marjorie and Ben

and the whole process that always left me uncomfortable." She added that BBBY's management was "very careful with our conversations with [Cohen]."

~~108.~~119. When pressed on why she distrusted Cohen, Gove pointed to the type of questions Cohen asked: "Just the actions of, you know, what he was questioning, why he was questioning, where he was going with things, you know."

~~109.~~120. Gove also singled out Rosenzweig for distrust. When asked why she did not trust him, Gove testified:

> A. Again, from the very first conversation I had with him, you know, the comment that he was acting as, you know, sort of, Ryan's agent, put me in, you know, a — a concerned state about that.
>
> Q. Anything else?
>
> A. From there, just his general approach in terms of, you know, what information he wanted access to, some of the things that we've discussed today.
>
> Q. Right. Like pushing to get information for Cohen?
>
> A. Uh-huh.

~~110.~~121. Gove also testified that board chair Edelman agreed with her that observers were right to question whether the Cohen Appointees were feeding Cohen material nonpublic information about BBBY.

~~111.~~122. And according to Gove, she and Edelman were not the only ones who harbored suspicion:

> [Q.] Who else agreed and thought that Cohen's nominees were signaling to him?
>
> A. I think from a board of director's standpoint, you would have to ask each one, but I would, you know, venture to say that probably most of them.
>
> Q. You thought most of them had doubts about that?

A. Had concerns, yes.

**4.     Summary**

~~112.~~123.        The Cohen Defendants functioned as directors of BBBY through the Cohen Appointees, who performed their duties not for themselves but for the Cohen Defendants.

~~113.~~124.        The Cohen Appointees actually and avowedly represented the Cohen Defendants on BBBY's board, and they were viewed as representing the Cohen Defendants by BBBY's management and the market.  Through the Cohen Appointees, the Cohen Defendants obtained access to and influence over management, as well as significant material nonpublic information about BBBY.

~~114.~~125.        As a result, the Cohen Defendants were deemed statutory directors of BBBY at all times from the appointment of the Cohen Appointees through the Cohen Appointees' departure from BBBY's board.  Any profit the Cohen Defendants realized from a "short-swing" transaction in BBBY's equity securities during this period is subject to recapture under Section 16(b).

**C.     The Cohen Defendants as BBBY's 10% Beneficial Owners**

~~115.~~126.        In addition to functioning as BBBY's statutory directors, the Cohen Defendants were subject to Section 16(b) for much of 2022 as beneficial owners of more than 10% of BBBY's outstanding common stock.

~~116.~~127.        When the Cohen Defendants first disclosed their BBBY position on March 7, 2022, the statement they filed with the SEC disclosed beneficial ownership of 9,450,100 shares.  Ex. A tbls. line 11.  The Cohen Defendants calculated that these 9,450,100 shares equaled 9.8% of BBBY's shares outstanding.  *Id.* line 13.

~~117.~~128. This percentage calculation assumed a denominator of 96,337,713 shares outstanding. *Id.* item 5(a). That was the number of BBBY shares outstanding on November 27, 2021, as disclosed in BBBY's quarterly report on Form 10-Q filed with the SEC on January 6, 2022. *Id.*

~~118.~~129. But by the time the Schedule 13D was filed in March 2022, BBBY's share count from November 2021 was stale, and the Cohen Defendants had abundant reason to know it was stale.

~~119.~~130. In the interval between the November 27 share count and the March 7 Schedule 13D, BBBY completed an aggressive and well publicized series of stock buybacks. The buybacks significantly reduced BBBY's shares outstanding, shrinking the denominator of the percentage beneficial ownership calculation and lifting the Cohen Defendants above 10%.

~~120.~~131. BBBY's board had approved its Accelerated Share Repurchase program back in October 2020. The program allowed BBBY to repurchase, subject to market conditions, up to $675 million worth of its stock in annual increments through the end of fiscal year 2023.

~~121.~~132. Just two months later, in December 2020, BBBY's board approved an additional Accelerated Share Repurchase program of $150 million. The new program brought the total dollar amount BBBY was authorized to repurchase through the end of fiscal year 2023 to $825 million.

~~122.~~133. The buybacks were expanded again in March 2021, when the board authorized BBBY to repurchase an additional $175 million in stock, bringing the total size of the Accelerated Share Repurchase program to $1 billion.

~~123.~~134. Finally, in October 2021, BBBY's board approved a further acceleration of the already "Accelerated" program. The latest move would pull forward to fiscal 2021 the $300 million in share repurchases previously scheduled for fiscal years 2022 and 2023.

~~124.~~135. Combined with the $100 million in capacity remaining under the Accelerated Share Repurchase program for fiscal year 2021, the October 2021 approval gave BBBY authority to repurchase a total of $300 million + $100 million = $400 million in stock in just the remaining few months of fiscal 2021.

~~125.~~136. All of the foregoing information about BBBY's stock repurchases was publicly disclosed before the Cohen Defendants began buying BBBY's stock in January 2022. For example, BBBY announced the October 2021 acceleration of the program in a press release filed on November 2, 2021.

~~126.~~137. A copy of the November 2, 2021 press release is attached as Exhibit H to this ~~complaint~~First Amended Complaint.

~~127.~~138. The November 2 press release disclosed not only that BBBY had authority to repurchase $400 million of its stock through the end of fiscal 2021 but that it expected to complete the repurchases on schedule:

> UNION, N.J., Nov. 2, 2021 — Bed Bath & Beyond Inc. (NASDAQ: BBBY) today announced that it expects to complete its $1 billion three-year share repurchase plan by the end of fiscal 2021, two years ahead of schedule.
>
> Program-to-date, the Company has completed $600 million in share repurchases since the end of fiscal 2020. ***The Company now expects to repurchase the remaining $400 million of the program by the end of fiscal 2021, specifically over the third and fourth quarters.***

Ex. H at 1 (emphasis added).

~~128.~~139. BBBY's fiscal year 2021 ended on February 26, 2022. Thus, any reasonable investor who read the November 2 press release was on notice that BBBY expected to repurchase $400 million of its stock in just the four months between November 2021 and February 2022.

~~129.~~140. BBBY confirmed that conclusion with an investor presentation published on January 6, 2022. The presentation disclosed that BBBY had already delivered on expectations by completing a total of $120 million in share repurchases in the third quarter of fiscal year 2021. It now expected to complete the Accelerated Share Repurchase program by purchasing around $275 million worth of stock in just the fourth quarter — a quarter that was close to half over.

~~130.~~141. On November 3, 2021, the day after the November 2 press release, BBBY's stock closed at $19.30 per share. At that price, $400 million in repurchase capacity would buy around 20.7 million BBBY shares.

~~131.~~142. By March 4, 2022, the last trading day before the Cohen Defendants filed their March 7 Schedule 13D, the stock was even cheaper. It closed on March 4 at just $16.18 per share.

~~132.~~143. Between November 2 and the end of fiscal 2021, BBBY's stock never traded above $25.72 per share.

~~133.~~144. Even if the entire $400 million in remaining repurchase capacity had been spent at that $25.72 peak, BBBY would have reduced its share count by $400,000,000 ÷ $25.72 = 15,552,099 shares during the remainder of fiscal 2021.

~~134.~~145. BBBY had disclosed 101,060,177 shares outstanding as of August 28, 2021 and, as previously alleged, 96,337,713 shares outstanding as of

November 27, 2021. It disclosed no stock offerings between August 28, 2021 and March 7, 2022, and its stock grants to senior management during that period (which had to be publicly disclosed) were de minimis.

~~135.~~146. So even if shares outstanding on November 2 were closer to the 101,060,177 outstanding on August 28 rather than the 96,337,713 outstanding on November 27, a post-November 2 repurchase of at least 15.5 million shares would have left BBBY with *at most* 85.6 million shares outstanding by the time the Cohen Defendants filed their Schedule 13D on March 7, 2022.

~~136.~~147. The 9,450,100 shares the Cohen Defendants beneficially owned on March 7, 2022 would then amount to more than 11% of shares outstanding.

~~137.~~148. It follows that, as long as BBBY completed its $400 million in accelerated buybacks on schedule — as it said it would, as analysts and investors expected it to do, and as BBBY itself later confirmed it was doing — then the Cohen Defendants were virtually assured to beneficially own more than 10% of BBBY's outstanding shares by the time they completed their final purchases in early March 2022.

~~138.~~149. The Cohen Defendants had reviewed BBBY's public disclosures and were well aware that it was rapidly repurchasing stock at the end of its 2021 fiscal year. The buybacks were even mentioned in Cohen's March 6 letter to BBBY's board. Ex. A ex. 99.1 at 2.

~~139.~~150. Yet the Cohen Defendants ignored this information in calculating their percentage beneficial ownership. They also ignored subsequent information BBBY disclosed about its share count, even when that information

confirmed beyond doubt that the Cohen Defendants' Schedule 13D had underreported their percentage beneficial ownership.

151.    ~~On~~Cohen had actual knowledge of the completion of BBBY's stock repurchase program no later than April 14, 2022.  He referred to the completion of the program in an email sent that day to his PR advisor.

~~140.~~152.    A week later, on April 21, 2022, BBBY filed with the SEC its annual report on Form 10-K disclosing that it had 79,845,789 shares outstanding on March 26, 2022.  The Cohen Defendants' 9,450,100 shares amounted to 11.8% of that total, significantly more than the 9.8% they had reported on their March 7 Schedule 13D.

~~141.~~153.    BBBY would go on to disclose virtually the same share count in its definitive proxy statement filed June 1, 2022 (79,886,442 shares outstanding on May 16) and its 2022 Q1 quarterly report filed June 29, 2022 (79,957,649 shares outstanding on May 28).

~~142.~~154.    These filings made plain that the denominator of 96,337,713 shares used in the March 7 Schedule 13D overstated the actual number of shares outstanding by more than 20%.

~~143.~~155.    Under SEC Rule 13d-2(a), the Cohen Defendants were required to amend their Schedule 13D to reflect any change in their percentage beneficial ownership of one percent or more, even if that change resulted only from a decrease in the share count.  The version of the rule in effect in 2022 required such an amendment to be filed "promptly."

~~144.~~156. Yet the Cohen Defendants did not amend the percentage beneficial ownership figures reported in their March 7 Schedule 13D until August 16, 2022, more than five months later.

~~145.~~157. The Cohen Defendants ignored all of the information BBBY disclosed about its shrinking share count even as they devoured every other morsel of information they could work out of their deputy directors or BBBY's management.

~~146.~~158. When properly calculated based on the number of BBBY shares actually outstanding, the Cohen Defendants' percentage beneficial ownership exceeded 10% before they finished purchasing BBBY's equity securities in March 2022.

~~147.~~159. Specifically, the Cohen Defendants passed the 10% mark no later than March 1, 2022, with their purchase that day of 5,000 call option contracts entitling them to buy 500,000 BBBY shares at $80.00 on or before January 20, 2023. With that purchase, the Cohen Defendants beneficially owned at least 8,670,554 shares while BBBY had no more than 81,979,000 shares outstanding.

~~148.~~160. The Cohen Defendants continued to beneficially own more than 10% of BBBY's common stock until August 16, 2022. With their open-market sale on August 16 of 65,442 shares (the last of a 5,000,000-share firm order placed with their broker that day~~,~~), the Cohen Defendants returned below the 10% line.

~~149.~~161. The Cohen Defendants disclosed their August 16 sales on a Statement of Changes in Beneficial Ownership on Form 4 filed with the SEC after the close of trading on August 18, 2022. A copy of that filing is attached as Exhibit I to this ~~complaint~~First Amended Complaint.

~~150.~~162. The trades disclosed on the August 18 Form 4 were the only transactions in BBBY's equity securities reported by the Cohen Defendants under Section 16(a) of the Act.

## II. THE PURCHASES, SALES, AND PROFIT

~~151.~~163. Table 1 below lists all of the transactions in BBBY's equity securities disclosed by the Cohen Defendants as occurring during the period of less than six months from February 22, 2022 through the final liquidation of their position on August 17, 2022. Set off in *italics* is the subset of transactions that the Cohen Defendants made while beneficially owning more than 10% of BBBY's common stock.

**Table 1. The Cohen Defendants' Purchases and Sales of BBBY's Equity Securities Within a Period of Less than Six Months (1)**

| Date | Transaction | Section 16(b) Treatment | Shares (2) | Price per Share (2) |
|---|---|---|---|---|
| 02/22/22 | Purchase of Common Stock | Purchase | 75,000 | $14.0310 |
| 02/24/22 | Purchase of Common Stock | Purchase | 367,833 | $15.2060 |
| 02/24/22 | Purchase of Common Stock | Purchase | 500,000 | $13.6600 |
| 02/24/22 | Purchase of Common Stock | Purchase | 500,000 | $14.5770 |
| 02/24/22 | Purchase of Common Stock | Purchase | 300,000 | $13.4260 |
| 02/25/22 | Purchase of Common Stock | Purchase | 542,621 | $16.2230 |
| 02/25/22 | Purchase of Common Stock | Purchase | 115,000 | $16.1140 |
| 02/28/22 | Purchase of Common Stock | Purchase | 500,000 | $16.6010 |
| 02/28/22 | Purchase of $60.00 January 2023 Call Option | Purchase | 475,700 | $16.8900 |
| 02/28/22 | Purchase of $75.00 January 2023 Call Option | Purchase | 24,300 | $16.8900 |
| 03/01/22 | Purchase of $60.00 January 2023 Call Option | Purchase | 500,000 | $16.6700 |
| 03/01/22 | Purchase of $60.00 January 2023 Call Option | Purchase | 150,000 | $16.6700 |
| 03/01/22 | Purchase of $75.00 January 2023 Call Option | Purchase | 20,100 | $16.6700 |
| 03/01/22 | Purchase of $80.00 January 2023 Call Option | Purchase | 500,000 | $16.6700 |
| *03/01/22* | *Purchase of Common Stock* | *Purchase* | *307,341* | *$16.9429* |
| *03/01/22* | *Purchase of Common Stock* | *Purchase* | *311,660* | *$16.7564* |
| *03/01/22* | *Purchase of Common Stock* | *Purchase* | *70,545* | *$16.6800* |
| *03/02/22* | *Purchase of Common Stock* | *Purchase* | *69,516* | *$17.2540* |
| *03/03/22* | *Purchase of Common Stock* | *Purchase* | *20,484* | *$16.8090* |
| *08/16/22* | *Sale of Common Stock* | *Sale* | *446,399* | *$18.6848* |
| *08/16/22* | *Sale of Common Stock* | *Sale* | *812,448* | *$19.4817* |
| *08/16/22* | *Sale of Common Stock* | *Sale* | *1,443,818* | *$20.7834* |

| Date | Transaction | Section 16(b) Treatment | Shares (2) | Price per Share (2) |
|---|---|---|---|---|
| *08/16/22* | *Sale of Common Stock* | *Sale* | *1,059,021* | *$21.4209* |
| *08/16/22* | *Sale of Common Stock* | *Sale* | *795,559* | *$22.7094* |
| *08/16/22* | *Sale of Common Stock* | *Sale* | *169,335* | *$23.3294* |
| *08/16/22* | *Sale of Common Stock* | *Sale* | *103,901* | *$24.8686* |
| *08/16/22* | *Sale of Common Stock* | *Sale* | *104,077* | *$25.5919* |
| *08/16/22* | *Sale of Common Stock* | *Sale* | *65,442* | *$26.2714* |
| 08/17/22 | Sale of Common Stock | Sale | 189,689 | $23.7337 |
| 08/17/22 | Sale of Common Stock | Sale | 512,185 | $24.6266 |
| 08/17/22 | Sale of Common Stock | Sale | 896,238 | $25.4997 |
| 08/17/22 | Sale of Common Stock | Sale | 610,828 | $26.4432 |
| 08/17/22 | Sale of Common Stock | Sale | 323,483 | $27.5756 |
| 08/17/22 | Sale of Common Stock | Sale | 140,788 | $28.5122 |
| 08/17/22 | Sale of Common Stock | Sale | 106,789 | $29.2192 |
| 08/17/22 | Sale of $60.00 January 2023 Call Option | Sale | 747,500 | $23.0800 |
| 08/17/22 | Sale of $60.00 January 2023 Call Option | Sale | 378,200 | $23.0800 |
| 08/17/22 | Sale of $75.00 January 2023 Call Option | Sale | 44,400 | $23.0800 |
| 08/17/22 | Sale of $80.00 January 2023 Call Option | Sale | 382,600 | $23.0800 |
| 08/17/22 | Sale of $80.00 January 2023 Call Option | Sale | 117,400 | $23.0800 |

(1) Transactions in *italics* were made while the Cohen Defendants beneficially owned more than 10% of BBBY's outstanding common stock. The August 16 sales were executed as part of a single, 5,000,000-share firm order placed by the Cohen Defendants with their broker.

(2) Call option trades are listed showing the number of underlying shares rather than the number of option contracts. The listed price per share represents the contemporaneous price of BBBY common stock at the time of trade, which is estimated for purposes of this ~~complaint~~First Amended Complaint based on the closing price on the trade date. *See* 17 C.F.R. § 240.16b-6(c)(2).

~~152.~~164. The Cohen Defendants made all of the trades in Table 1 over the open market. The trades included garden-variety purchases and sales of BBBY common stock as well as trades in standardized call option contracts on that stock.

~~153.~~165. The call options listed in Table 1 gave the Cohen Defendants the unilateral right to purchase BBBY's common stock at fixed exercise prices at any time on or before option expiration. The value of the options tended to increase or decrease as the underlying stock price increased or decreased, and the options

accordingly gave the Cohen Defendants "long" or "call equivalent" exposure to BBBY's common stock.

~~154.~~166. Under Rules 16a-1(b), (c) and 16b-6(a), the purchases and sales of these call options are properly treated as purchases and sales of BBBY's underlying common stock for purposes of Section 16(b) of the Act. 17 C.F.R. §§ 240.16a-1(b), (c), 240.16b-6(a).

~~155.~~167. So treated, the purchases and sales of these call options may be matched with any sales and purchases, respectively, of the underlying stock within any period of less than six months. Under Rule 16b-6(c)(2), the purchases and sales of the call options are matched with sales and purchases of the stock at the contemporaneous prices of BBBY's common stock at the time of the matching trades. *See id.* § 240.16b-6(c)(2).

~~156.~~168. The contemporaneous price of the common stock is estimated in Table 1 from the closing price of BBBY's publicly traded common stock on the date of each purchase or sale of call options. Discovery will reveal the contemporaneous price of the common stock at the moment each call option was purchased or sold.

~~157.~~169. Under the "lowest-in, highest-out" method for computing realized profit pursuant to Section 16(b) of the Act, the Cohen Defendants realized a profit estimated at approximately $47,173,867.96 from the transactions in Table 1.

~~158.~~170. Under the plain terms of Section 16(b) of the Act, the Cohen Defendants are liable to repay this profit in its entirety because the profit was

realized while the Cohen Defendants acted as statutory directors through their deputies on BBBY's board.

~~159.~~171. The Cohen Defendants are independently liable under the statute to repay the profit realized from the italicized transactions in Table 1 because those transactions were made while the Cohen Defendants beneficially owned more than 10% of BBBY's outstanding common stock.

~~160.~~172. Under the "lowest-in, highest-out" method for computing realized profit pursuant to Section 16(b) of the Act, the Cohen Defendants realized a profit of approximately $5,415,398.40 from their transactions while beneficially owning more than 10% of BBBY's outstanding common stock. That profit is recoverable irrespective of any liability the Cohen Defendants may have in their capacity as BBBY's statutory directors.

**SOLE CLAIM FOR RELIEF:**
**RECOVERY OF SHORT-SWING PROFIT UNDER 15 U.S.C. § 78p(b)**
**(AGAINST EACH COHEN DEFENDANT)**

~~161.~~173. BBBY realleges and incorporates by reference the allegations in paragraphs 1-~~160~~172 above.

~~162.~~174. Section 16(b) of the Securities Exchange Act of 1934, as amended, reads in pertinent part as follows:

> For the purpose of preventing the unfair use of information which may have been obtained by [a 10 percent] beneficial owner, director, or officer by reason of his relationship to the issuer, any profit realized by him from any purchase and sale, or any sale and purchase, of any equity security of such issuer (other than an exempted security) or a security-based swap agreement involving any such equity security within any period of less than six months, unless such security or security-based swap agreement was acquired in good faith in connection with a debt previously contracted, shall inure to and be recoverable by the issuer, irrespective of any intention on the part of such beneficial owner,

> director, or officer in entering into such transaction of holding the security or security-based swap agreement purchased or of not repurchasing the security or security-based swap agreement sold for a period exceeding six months. Suit to recover such profit may be instituted at law or in equity in any court of competent jurisdiction by the issuer, or by the owner of any security of the issuer in the name and in behalf of the issuer if the issuer shall fail or refuse to bring such suit within sixty days after request or shall fail diligently to prosecute the same thereafter; but no such suit shall be brought more than two years after the date such profit was realized.

15 U.S.C. § 78p(b).

~~163.~~175. At all relevant times after March 24, 2022, each Cohen Defendant qualified as a statutory director of BBBY and was subject to Section 16(b) of the Act.

~~164.~~176. At all times from March 1, 2022 through August 16, 2022, each Cohen Defendant beneficially owned more than 10% of BBBY's outstanding common stock and was also thereby subject to Section 16(b) of the Act.

~~165.~~177. While subject to Section 16(b) of the Act, the Cohen Defendants realized a profit upon the sale of BBBY's equity securities as further alleged herein.

~~166.~~178. Each of the Cohen Defendants' sales of BBBY's equity securities was made within a period of less than six months of, and at higher prices than, purchases of BBBY's equity securities by the Cohen Defendants.

~~167.~~179. Certain of the Cohen Defendants' purchases and sales of BBBY's equity securities within a period of less than six months were also made while the Cohen Defendants beneficially owned more than 10% of BBBY's outstanding common stock as further alleged herein.

~~168.~~180. Each Cohen Defendant had a direct or indirect pecuniary interest in all of the purchases and sales of BBBY's equity securities alleged herein.

~~169.~~181. Under the "lowest-in, highest-out" method for computing realized profit pursuant to Section 16(b) of the Act, the Cohen Defendants realized a recoverable profit estimated at not less than $47,173,867.96 from their purchases and sales of BBBY's equity securities within a period of less than six months.

~~170.~~182. Under the "lowest-in, highest-out" method for computing realized profit pursuant to Section 16(b) of the Act, the Cohen Defendants realized a recoverable profit of not less than $5,415,398.40 from their purchases and sales of BBBY's equity securities within a period of less than six months while beneficially owning more than 10% of BBBY's outstanding common stock.

~~171.~~183. Under Section 16(b) of the Act, the profit realized by the Cohen Defendants as alleged herein inured to and is recoverable by BBBY.

**PRAYER FOR RELIEF**

WHEREFORE, BBBY prays this Court for judgment:

(a) Requiring each Cohen Defendant to account for and pay over to BBBY the short-swing profit realized and retained by such Cohen Defendant in violation of Section 16(b) of the Act in a total amount not less than $47,173,867.96, together with appropriate pre- and post-judgment interest and the costs of this suit;

(b) Awarding BBBY its costs and disbursements including reasonable attorney's, accountant's, and expert witness fees; and

(c) Granting BBBY such further relief as the Court deems just and proper.

**DEMAND FOR JURY TRIAL**

BBBY respectfully demands a trial by jury on each and every question so triable.

Dated: ~~August 1~~November 8, 2024

Respectfully submitted,

/s/ James A. Hunter

James A. Hunter
S.D.N.Y. Bar No. JH–1910
LAW OFFICE OF JAMES A. HUNTER
201 King of Prussia Road, Suite 650
Radnor, Pennsylvania 19087
Phone: +1 (484) 275-2162
Fax: +1 (646) 462-3356
Email: hunter@hunterkmiec.com

*Counsel for Plaintiff 20230930-DK-Butterfly-1, Inc., f/k/a Bed Bath & Beyond Inc.*