# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

20230930-DK-BUTTERFLY-1, INC., f/k/a
BED BATH & BEYOND INC.,

      Plaintiff,

           – v. –

RYAN COHEN and
RC VENTURES LLC,

      Defendants.

ECF CASE

No. 24-cv-5874 (NRB)

## MEMORANDUM OF LAW OF PLAINTIFF
## 20230930-DK-BUTTERFLY-1, INC., f/k/a BED BATH & BEYOND INC.
## IN OPPOSITION TO THE COHEN DEFENDANTS' MOTION TO DISMISS

James A. Hunter
LAW OFFICE OF JAMES A. HUNTER
201 King of Prussia Road, Suite 650
Radnor, Pennsylvania  19087
Phone: +1 (484) 275-2162
Fax:     +1 (646) 462-3356
Email:  hunter@hunterkmiec.com

*Counsel for Plaintiff 20230930-DK-Butterfly-1, Inc., f/k/a Bed Bath & Beyond Inc.*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................. iii

INTRODUCTION ......................................................................................................... 1

STATEMENT OF FACTS .............................................................................................. 2

    A.    The Cohen Defendants as BBBY's 10% Beneficial Owners .................................. 2

    B.    The Cohen Defendants as BBBY's Statutory Directors .......................................... 4

    C.    The Cohen Defendants' Purchases, Sales, and Profit .............................................. 5

    D.    Procedural History ................................................................................................ 6

LEGAL STANDARDS .................................................................................................. 7

ARGUMENT ............................................................................................................... 7

I.    THE FAC PLAUSIBLY ALLEGES THAT THE COHEN DEFENDANTS
    REALIZED A SHORT-SWING PROFIT AS BENEFICIAL OWNERS
    OF MORE THAN 10% OF BBBY'S OUTSTANDING COMMON STOCK .................. 7

    A.    The Cohen Defendants Must Plead and Prove Their Reasonable
        Reliance on BBBY's Periodic Reports at the Time They Purchased
        Its Equity Securities ............................................................................................. 9

    B.    The FAC Plausibly Alleges the Cohen Defendants Had "Reason
        to Believe" BBBY's November 2021 Share Count Was Inaccurate
        in March 2022 ..................................................................................................... 11

II.    THE FAC PLAUSIBLY ALLEGES THAT THE COHEN DEFENDANTS
    REALIZED A SHORT-SWING PROFIT AS BBBY'S STATUTORY
    DIRECTORS ......................................................................................................... 15

    A.    The FAC Plausibly Alleges That the Cohen Defendants Acted as
        BBBY's Directors by Deputization Through the Cohen Appointees ..................... 16

        1.    The FAC Adequately Pleads That the Cohen Appointees
            Were Appointed to Represent the Cohen Defendants'
            Interests (Factors 1-2) ............................................................................... 18

        2.    The FAC Adequately Pleads That the Cohen Defendants Used
            Material Nonpublic Information Obtained from the Cohen
            Appointees to Inform Their Investment Strategy (Factors 3-5) ................... 19

B.    A Statutory Director Must Disgorge the Short-Swing Profit from His Sale of Issuer Stock Even if the Matching Purchase Preceded His Directorship ............................................................................21

III.    AN AFFIRMATIVE DEFENSE UNDER SECTION 23(a) OF THE ACT FINDS NO SUPPORT IN THE FAC AND CANNOT SUSTAIN A MOTION TO DISMISS ...................................................................................24

CONCLUSION.........................................................................................................25

CERTIFICATE OF COMPLIANCE ......................................................................26

# TABLE OF AUTHORITIES

## Cases

*Adler v. Klawans*, 267 F.2d 840 (2d Cir. 1959) .................................................................. passim

*Analytical Surveys, Inc. v. Tonga Partners, L.P.*, 684 F.3d 36 (2d Cir. 2012) ............................. 8

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ...................................................................................... 7

*Blau v. Lehman*, 368 U.S. 403 (1962) ........................................................................................ 16

*C.R.A. Realty Corp. v. Enron Corp.*, 842 F. Supp. 88 (S.D.N.Y. 1994) ........................... 10, 13, 14

*Calenture, LLC v. Pulte*, No. 21-cv-402 (PKC),
    2022 U.S. Dist. LEXIS 57538 (S.D.N.Y. Mar. 29, 2022) ................................................. 17

*Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*,
    467 U.S. 837 (1984) .......................................................................................................... 23, 24

*Credit Suisse Sec. (USA) LLC v. Tracy*, 812 F.3d 249 (2d Cir. 2016) ............................................ 8

*Dane v. UnitedHealthcare Ins. Co.*, 974 F.3d 183 (2d Cir. 2010) .................................................. 7

*Feder v. Martin Marietta Corp.*, 286 F. Supp. 937 (S.D.N.Y. 1968),
    *rev'd*, 406 F.2d 260 (2d Cir. 1969) .................................................................................... 17

*Feder v. Martin Marietta Corp.*, 406 F.2d 260 (2d Cir. 1969) ....................................... 16, 17, 18

*Greene v. Dietz*, 247 F.2d 689 (2d Cir. 1957) ............................................................................ 25

*Gryl v. Shire Pharms. Group PLC*, No. 00 CV 9173 (HB),
    2001 U.S. Dist. LEXIS 13371 (S.D.N.Y. Aug. 30, 2001),
    *aff'd*, 298 F.3d 136 (2d Cir. 2002) .................................................................................... 22

*Gryl v. Shire Pharms. Grp. PLC*, 298 F.3d 136 (2d Cir. 2002) .................................................... 23

*Harsco Corp. v. Segui*, 91 F.3d 337 (2d Cir. 1996) ..................................................................... 9

*In re Bed Bath & Beyond Corp. Sec. Litig.*, 687 F. Supp. 3d 1 (D.D.C. 2023) ...................... 5, 19

*In re Bed Bath & Beyond Inc. Section 16(b) Litig.*, No. 22-cv-9327 (DEH),
    2024 U.S. Dist. LEXIS 104712 (S.D.N.Y. filed June 11, 2024) ...................................... 6

*In re Luxottica Group S.p.A. Securities Litigation*,
    293 F. Supp. 2d 224 (E.D.N.Y. 2003) ............................................................................. 14

*Katz v. Comodo Holdings, Ltd.*, No. 13 Civ. 2585 (NRB),
    2014 U.S. Dist. LEXIS 39643 (S.D.N.Y. Mar. 18, 2014) ................................................ 23

*Kirschner v. Robeco Cap. Growth Funds*, 87 F.4th 130 (2d Cir. 2023) .................................. 10, 24

*Loper Bright Enterprises v. Raimondo*, 144 S. Ct. 2244 (2024) ....................................... 22, 23, 24

*Meacham v. Knolls Atomic Power Lab.*, 554 U.S. 84 (2008) ......................................................... 9

*Olagues v. Icahn*, 866 F.3d 70 (2d Cir. 2017) .......................................................................... 9, 10

*Olagues v. Perceptive Advisors LLC*, 902 F.3d 121 (2d Cir. 2018) ......................................... 7, 15

*Perlman v. Timberlake*, 172 F. Supp. 246 (S.D.N.Y. 1959) ........................................................ 25

*Revive Investing LLC v. Armistice Cap. Master Fund, Ltd.*, No. 20-cv-2849,
    2023 U.S. Dist. LEXIS 153523 (S.D.N.Y. Aug. 30, 2023) .............................................. 17

*Roth v. Armistice Cap., LLC*, No. 20-cv-8872 (JLR),
    2024 U.S. Dist. LEXIS 56887 (S.D.N.Y. Mar. 27, 2024) ................................................ 17

*Roth v. Jennings*, 489 F.3d 499 (2d Cir. 2007) .......................................................................... 13

*Roth v. Perseus, L.L.C.*, 522 F.3d 242 (2d Cir. 2008) ................................................................. 16

*Rothstein v. UBS AG*, 708 F.3d 82 (2d Cir. 2013) ........................................................................ 7

*Rubenstein v. Int'l Value Advisers, LLC*, 959 F.3d 541 (2d Cir. 2020) ...................................... 17

*SEC v. Fiore*, 416 F. Supp. 3d 306 (S.D.N.Y. 2019) ................................................................. 9, 10

*SM Kids, LLC v. Google LLC*, 963 F.3d 206 (2d Cir. 2020) ......................................................... 7

*United States v. Leon*, 766 F.2d 77 (2d Cir. 1985) .................................................................... 16

**Statutes**

15 U.S.C. § 78c(a)(7) ................................................................................................................. 16

15 U.S.C. § 78c(a)(9) ................................................................................................................. 16

15 U.S.C. § 78p(b) ............................................................................................................. passim

15 U.S.C. § 78w(a)(1) ................................................................................................................ 24

**Rules**

17 C.F.R. § 240.13d-1(j) .................................................................................................... passim

17 C.F.R. § 240.16a-1(a)(1) ............................................................................................... passim

17 C.F.R. § 240.16a-2(a) ............................................................................................................ 21

## Treatises

Peter J. Romeo & Alan L. Dye,
     Section 16 Treatise and Reporting Guide (6th ed. 2024)........................................... passim

## Other Authorities

Exchange Act Section 16 and Related Rules and Forms,
     Compliance & Disclosure Interpretation No. 209.02, *available at*
     https://www.sec.gov/rules-regulations/staff-guidance/compliance-disclosure-
     interpretations/exchange-act-section-16-related-rules-forms ........................................... 12

Ownership Reports and Trading by Officers, Directors and Principal Security Holders,
     Exchange Act Release No. 34-28869, 56 Fed. Reg. 7242 (Feb. 21, 1991) ..................... 22

Plaintiff 20230930-DK-Butterfly-1, Inc., f/k/a Bed Bath & Beyond Inc. ("BBBY"),
respectfully submits this memorandum of law in opposition to the motion of the Cohen
Defendants [Dkt. 24] to dismiss the First Amended Complaint [Dkt. 17] ("FAC").[1]

## INTRODUCTION

To plead a legally sufficient Section 16(b) claim, the FAC must allege that the Cohen
Defendants realized a short-swing profit either as BBBY's statutory directors or as beneficial
owners of more than 10% of its outstanding common stock.  To win dismissal, therefore, the
motion must prevail on both of the Cohen Defendants' principal arguments.  It must establish
that the FAC does not adequately allege that the Cohen Defendants were *either* BBBY's 10%
beneficial owners *or* its statutory directors.  The motion establishes neither and should be denied.

The motion fails first from simple math.  The Cohen Defendants concede that "RCV had
beneficially owned 11.5% of BBBY's shares following its last purchase of BBBY shares on
March 3, 2022."  Mem. of Law in Supp. of Mot. to Dismiss [Dkt. 25] ("Mem.") at 8.  Basic
arithmetic shows that if the Cohen Defendants beneficially owned more than 11.5% of BBBY's
shares on March 3, then they also beneficially owned more than 10% of its shares before some of
their purchases on March 1, 2, and 3.  Their contrary position relies entirely on Rule 13d-1(j), an
affirmative defense that cannot sustain a motion to dismiss but must be pled and proved.

Because the FAC pleads a plausible Section 16(b) claim against the Cohen Defendants as
10% beneficial owners, the Court does not need to decide whether they also plausibly realized a
profit as BBBY's directors by deputization.  Their arguments fail on that issue anyway.  Another
court has already found that the Cohen Defendants plausibly misused inside information, gutting
their main challenge to the FAC's factual allegations.  The Cohen Defendants' legal arguments

---

[1] Capitalized terms not defined in this brief are used as defined in the FAC.

fare no better. They rely on a post hoc application of Rule 16a-2(a), an invalid regulation that contravenes the statutory text as interpreted by the Second Circuit. The Cohen Defendants' challenges to the FAC's deputization allegations thus fail on both the facts and the law.

This is a straightforward case of strict liability, and the numbers don't lie. The Cohen Defendants beneficially owned more than 10% of BBBY's outstanding common stock between March 1 and August 16, 2022, a less-than-six-month period during which they profitably bought and sold BBBY's equity securities. No dispensation from this strict liability can be found in Section 23(a) of the Act, nor can any affirmative defense be maintained under Rule 12(b)(6). The FAC sufficiently pleads all elements of liability, and the motion to dismiss should be denied.

## STATEMENT OF FACTS

### A.    The Cohen Defendants as BBBY's 10% Beneficial Owners

The Cohen Defendants bought their first BBBY securities in January 2022. FAC ¶ 14. By early March, they beneficially owned 9,450,100 shares of its common stock. *Id.* ¶ 15. Those shares amounted to about 11.5% of BBBY's shares then outstanding, *see id.* ¶¶ 152, 159, 163, Mem. at 8, but that's not the percentage the Cohen Defendants reported when they publicly disclosed their investment on March 7, 2022. In a Schedule 13D filed that day with the SEC, the Cohen Defendants reported beneficial ownership of just 9.8% of BBBY's shares outstanding. FAC ex. A tbls. This reporting assumed a denominator of 96,337,713 shares. *See id.* ¶ 128; *id.* ex. A item 5(a). That was the number of shares outstanding on November 27, 2021, as disclosed in BBBY's quarterly report on Form 10-Q filed with the SEC on January 6, 2022. *Id.* ¶ 128.

But by the time the Cohen Defendants made their last purchases in early March 2022, the November 2021 share count was stale, and the Cohen Defendants had abundant reason to know it was stale. *Id.* ¶ 129. Between November 27 and early March, BBBY completed a well publicized stock repurchase program that significantly reduced its shares outstanding. *Id.* ¶ 130.

A November 2 press release had announced that BBBY would repurchase $400 million of its stock in just the last few months of fiscal 2021 — i.e., by February 26, 2022.  *Id.* ¶¶ 138-139.

The buybacks were confirmed in a BBBY investor presentation on January 6, 2022.  *Id.* ¶ 140.  The presentation disclosed that BBBY had already bought $120 million of stock in the third quarter of fiscal 2021 and expected to repurchase about $275 million more by February 26.  *Id.* ¶ 140.  A January 6 press release also disclosed that BBBY had spent "$0.1 billion in capital expenditures and share repurchase[s]" just in the "quarter-to-date."  Decl. of James A. Hunter in Opp. to Mot. to Dismiss ("Hunter Decl.") ex. A at 3.  Investors were thus on notice on January 6 that BBBY had bought as much as $100 million of its stock *after* the November 27 share count on which the Cohen Defendants claim to have relied in early March.  *See id.*; Decl. of Maxwell G. Dillan in Supp. of Mot. to Dismiss [Dkt. 26] ("Dillan Decl.") ex. 1 cover.

Between the November 2 announcement of the $400 million repurchase plan and the February 26 fiscal year-end, BBBY's stock never traded above $25.72 per share.  FAC ¶ 143.  Even if all $400 million of repurchase capacity had been spent at that $25.72 peak, BBBY would have reduced its outstanding common stock by a minimum of 15,552,099 shares by February 26.  *Id.* ¶ 144.  BBBY would thus have outstanding *at most* 85.6 million shares by the time the Cohen Defendants were completing their purchases in early March.  *Id.* ¶ 146.  The 9,450,100 shares the Cohen Defendants beneficially owned on March 7 would then amount to more than $9,450,100 \div 85,600,000 \approx 11\%$ of that maximum base.  *Id.* ¶ 147.

The Cohen Defendants were aware of BBBY's disclosures about its repurchase program.  *Id.* ¶ 149.  The trading range of BBBY's common stock between the November 2 announcement and the close of fiscal 2021 was public knowledge.  By the time the Cohen Defendants were making their final purchases of BBBY's equity securities in early March 2022, therefore, they

had all the information they needed to calculate the minimum reduction in BBBY's shares outstanding.  *See id.* ¶¶ 148-149.  These public facts gave them abundant reason to believe that the November 2021 share count was no longer accurate.  *Id.* ¶¶ 129, 150.

### B.    The Cohen Defendants as BBBY's Statutory Directors

On March 25, 2022, BBBY announced its entry into the Cooperation Agreement with the Cohen Defendants.  *Id.* ¶ 23; *id.* ex. B ex. 99.1.  Pursuant to the agreement, BBBY added three new members to its board: Marjorie L. Bowen, Shelly C. Lombard, and Benjamin Rosenzweig. *Id.* ¶ 24.  These additions were handpicked by Cohen, and the Cohen Defendants had the right to appoint a successor director if one of them resigned.  *See id.* ¶¶ 24, 27.  The agreement also obligated BBBY to appoint directors Bowen and Rosenzweig to a new four-member Strategy Committee of the board to determine the fate of BBBY's buybuy BABY business.  *Id.* ¶ 25.

The Cohen Appointees officially joined BBBY's board on March 24, 2022, and Bowen and Rosenzweig joined the Strategy Committee that same day.  *Id.* ¶ 32.  Rosenzweig announced to management at his very first meeting that he "will be representing Ryan as if I owned the 10% myself."  *Id.* ¶ 41.  He doubled down at a later meeting that same day, adding that "Ryan does not want to be on the board — [he] wants directors on as indirect proxy."  *Id.* ¶ 42.

The Cohen Appointees acted as that "proxy."  They worked to advance Cohen's agenda on cost-cutting and the sale of buybuy Baby.  *See id.* ¶¶ 21, 25, 47.  They urged BBBY to "partner" with Cohen in turning the company around.  *Id.* ¶ 48.  They caucused apart from the rest of the board, admonishing one another in private meetings to "[f]ollow Ryan's playbook." *Id.* ¶¶ 53, 55.  They talked privately with Cohen, and director Rosenzweig admitted to giving Cohen confidential information about BBBY management.  *See id.* ¶¶ 58-61.  They inveigled management to give Cohen further material nonpublic information, and succeeded in getting him access to an unreleased earnings report.  *See id.* ¶¶ 44-51, 66-68.  And when rumors swirled that

material nonpublic information had informed Cohen's August 2022 sales of BBBY's equity securities, one of the Cohen Appointees ran interference for him, urging management to issue an exculpatory press release.  *Id.* ¶¶ 111-112.

The view that Cohen had misused inside information from the Cohen Appointees to trade in BBBY's equity securities was widely held both within and beyond BBBY.  *See id.* ¶¶ 102, 106-107, 111, 115-116.  BBBY's CEO testified that she suspected the Cohen Appointees of slipping him material nonpublic information, and that other board members shared her suspicion. *Id.* ¶¶ 117-118, 121-122.  A journalist accused Cohen of insider trading on national television. *Id.* ¶¶ 106-107.  Within days of the Cohen Defendants' sales, a putative class action lawsuit was filed accusing them of insider trading based on tips from BBBY management.  *See In re Bed Bath & Beyond Corp. Sec. Litig.*, No. 22-cv-2541 (D.D.C. filed Aug. 23, 2022).  The Cohen Defendants challenged the plausibility of that allegation under Rule 12(b)(6) — and lost.  *See In re Bed Bath & Beyond Corp. Sec. Litig.*, 687 F. Supp. 3d 1, 15 (D.D.C. 2023) ("Cohen plausibly traded on material, adverse, and nonpublic information.").

### C.    The Cohen Defendants' Purchases, Sales, and Profit

On August 16 and 17, 2022, during a transitory spike in BBBY's stock price, the Cohen Defendants unloaded their entire BBBY position.  FAC ¶ 163.  Upon these sales, all made while the Cohen Appointees were acting as their board representatives, the Cohen Defendants realized a "short-swing" profit of more than $47 million.  *Id.* ¶¶ 169-170.  A portion of this profit also resulted from purchases and sales the Cohen Defendants made while beneficially owning more than 10% of BBBY's common stock.  *Id.* ¶¶ 163, 171.  That portion of the profit, estimated at not less than $5,415,398.40, is recoverable by BBBY irrespective of the Cohen Defendants' status as BBBY's statutory directors.  *Id.* ¶ 172.

**D.     Procedural History**

Not long after the Cohen Defendants' sales, two BBBY stockholders sued them in separate actions (collectively, the "Stockholder Actions") under Section 16(b) of the Act.  *In re Bed Bath & Beyond Inc. Section 16(b) Litig.*, No. 22-cv-9327 (S.D.N.Y. consol. Dec. 12, 2022) (Dkt. 20).  BBBY initially supported the Cohen Defendants' efforts to have the Stockholder Actions dismissed.  *See* Letter of Jared Gerber, No. 22-cv-9327 (S.D.N.Y. filed Dec. 8, 2022) (Dkt. 19).  At that time, BBBY remained subject to the Cooperation Agreement, which forbad it to "institute, solicit, join or assist in any lawsuit, claim or proceeding before any court or government agency" against the Cohen Defendants.  FAC ex. B ex. 99.1 § 13.

Following BBBY's bankruptcy and the termination of the Cooperation Agreement, BBBY moved for substitution as plaintiff to prosecute the Stockholder Actions in its own name.  Motion for Substitution, No. 22-cv-9327 (S.D.N.Y. filed Dec. 6, 2023) (Dkt. 82).  Meanwhile, the Cohen Defendants filed a new motion to dismiss the Stockholder Actions on the ground that the cancellation of the plaintiffs' stock in BBBY's bankruptcy had mooted their claims.  Amended Omnibus Motion to Dismiss, No. 22-cv-9327 (S.D.N.Y. filed Nov. 8, 2023) (Dkt. 64).  Judge Ho granted the Cohen Defendants' motion and dismissed the case as moot.  *In re Bed Bath & Beyond Inc. Section 16(b) Litig.*, No. 22-cv-9327 (DEH), 2024 U.S. Dist. LEXIS 104712, at *20 (S.D.N.Y. filed June 11, 2024).  He denied BBBY's motion for substitution without prejudice to its right to refile a new suit in its own name.  *See id.* at *19-*20.

BBBY filed its complaint in this case on August 1, 2024.  Dkt. 1.  On October 4, the Cohen Defendants submitted a pre-motion letter for leave to file a motion to dismiss, which this Court granted subject to BBBY's right to file an amended complaint.  Dkts. 14, 16.  BBBY filed the FAC on November 8, Dkt. 17, which the Cohen Defendants moved to dismiss with this Court's leave on December 9, Dkts. 21, 24.

## LEGAL STANDARDS

To state a claim under Section 16(b), a plaintiff must sufficiently plead (1) a purchase and (2) sale of equity securities (3) within a period of less than six months (4) by a director or officer of the issuer or any beneficial owner of more than 10% of any registered class of the issuer's equity securities. *E.g.*, *Olagues v. Perceptive Advisors LLC*, 902 F.3d 121, 125 (2d Cir. 2018). The motion challenges only the last of these elements, arguing that the FAC insufficiently alleges that the Cohen Defendants realized a recoverable profit as either BBBY directors or as beneficial owners of more than 10% of its outstanding common stock. Mem. at 11.

In deciding the motion, the Court must accept the FAC's well-pleaded allegations as true and draw all reasonable inferences in BBBY's favor. *E.g.*, *Dane v. UnitedHealthcare Ins. Co.*, 974 F.3d 183, 188 (2d Cir. 2010). The motion fails if the FAC pleads sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). But the Court need not credit "conclusory allegations or legal conclusions couched as factual allegations." *Rothstein v. UBS AG*, 708 F.3d 82, 94 (2d Cir. 2013).

The movant has the burden to show that a complaint fails to state a claim under Rule 12(b)(6). *See, e.g.*, *SM Kids, LLC v. Google LLC*, 963 F.3d 206, 214 (2d Cir. 2020).

## ARGUMENT

**I.     THE FAC PLAUSIBLY ALLEGES THAT THE COHEN DEFENDANTS REALIZED A SHORT-SWING PROFIT AS BENEFICIAL OWNERS OF MORE THAN 10% OF BBBY'S OUTSTANDING COMMON STOCK**

The FAC alleges that the Cohen Defendants beneficially owned more than 10% of BBBY's common stock between March 1 and August 16, 2022, during which time they made profitable purchases and sales of its equity securities. FAC ¶¶ 163, 171. This allegation rests on simple arithmetic. BBBY had outstanding no more than 81,979,000 shares in early March 2022, and the Cohen Defendants beneficially owned 9,450,100, or about 11.5% of them. FAC ¶¶ 127,

159. Even the Cohen Defendants are forced to concede that "RCV had beneficially owned 11.5% of BBBY's shares following its last purchase of BBBY shares on March 3, 2022." Mem. at 8. And if the Cohen Defendants beneficially owned 11.5% of BBBY's shares on March 3, then simple subtraction shows that they beneficially owned more than 10% of BBBY's shares before some of their purchases on March 1, 2, and 3 as well. *See* FAC ¶¶ 159, 163.

So the Court need not worry about "'exceed[ing] a literal, mechanical application of the statutory text.'" Mem. at 11 (quoting *Olagues*, 902 F.3d at 126) (cleaned up). Under a "literal, mechanical application of the statutory text," the Cohen Defendants are liable, period.

What the Cohen Defendants really want is not a literal and mechanical application of the statutory text but a loose and subjective application of a statutory exemption. They invoke Rule 13d-1(j), arguing that they did not know they had crossed the 10% line because they relied on BBBY's last reported share count in calculating their percentage beneficial ownership. Mem. at 20. But even if Section 16(b) is construed "against liability," *id.* at 11, no such construction is owed to Rule 13d-1(j). *See Analytical Surveys, Inc. v. Tonga Partners, L.P.*, 684 F.3d 36, 44 n.13 (2d Cir. 2012) ("That the scope of § 16(b)'s prohibition should be construed narrowly does not, in our view, suggest that § 16(b)'s exemptions for certain conduct *within* that scope must be construed broadly."). The rule must be interpreted like any other regulation, according to its plain terms. *See, e.g.*, *Credit Suisse Sec. (USA) LLC v. Tracy*, 812 F.3d 249, 254 (2d Cir. 2016).

The plain terms of Rule 13d-1(j) foreclose the Cohen Defendants' argument. To shelter in the rule's safe harbor, the Cohen Defendants have the burden to plead and prove that they reasonably relied on BBBY's last reported share count, a burden that cannot be met on a Rule 12(b)(6) motion. And even if the burden fell to BBBY to plead that the Cohen Defendants did *not* reasonably rely on BBBY's reporting, the FAC easily carries that burden.

**A.    The Cohen Defendants Must Plead and Prove Their Reasonable Reliance on BBBY's Periodic Reports at the Time They Purchased Its Equity Securities**

"The burden of proving justification or exemption under a special exception to the prohibitions of a statute generally rests on one who claims its benefits." *E.g.*, *Meacham v. Knolls Atomic Power Lab.*, 554 U.S. 84, 91 (2008) (cleaned up).  In the securities context, a party that claims to have reasonably relied on another's statement generally has the burden to prove it.  *See, e.g.*, *Harsco Corp. v. Segui*, 91 F.3d 337, 342 (2d Cir. 1996).  Given these principles, it should come as no surprise that when a defendant invokes Rule 13d-1 as a defense to liability, he has the burden to plead and prove reasonable reliance on the issuer's reporting.  *See SEC v. Fiore*, 416 F. Supp. 3d 306 (S.D.N.Y. 2019).

The defendant in *Fiore* filed a motion to dismiss, arguing that he "should not be held liable for violating § 13(d) because he acted in reliance on Plandai's public filings, which incorrectly stated that Plandai was not a Section 12 reporting company."  *Id.* at 330.  The Court denied the motion, concluding that the defendant's state of mind had no bearing on the pleading's sufficiency, since "[t]he Second Circuit has specifically held that 'scienter is not an element of civil claims under' § 13(d)."  *Id.* (quoting *SEC v. McNulty*, 137 F.3d 732, 741 (2d Cir. 1998)).  The Court placed the burden of proving reasonable reliance on the defendant: "Although Fiore may be able to establish a defense if he reasonably relied on Plandai's inaccurate filings, Fiore's reasonable reliance is a mixed question of fact and law that cannot be resolved solely from the facts alleged in the Complaint."  *Id.*

Like a claim under Section 13(d), a claim under Section 16(b) requires no proof of reliance or scienter.  *See, e.g.*, *Olagues v. Icahn*, 866 F.3d 70, 72 (2d Cir. 2017) ("Section 16(b) imposes a form of strict liability . . . ."); *Adler v. Klawans*, 267 F.2d 840, 845 (2d Cir. 1959) ("[A]ctual reliance, motive and intent are not relevant . . . .").  If any issue is to be made of the

Cohen Defendants' reasonable reliance on BBBY's reporting, it can only be as a "defense" that the Cohen Defendants must "establish." *Fiore*, 416 F. Supp. 3d at 330.[2]

Placing the burden of proving reasonable reliance where it belongs, on the Cohen Defendants, dooms their motion. A court may grant a Rule 12(b)(6) motion on the basis of an affirmative defense "only when facts supporting the defense appear on the face of the complaint." *Kirschner v. Robeco Cap. Growth Funds*, 87 F.4th 130, 142 (2d Cir. 2023). The facts necessary to establish the Cohen Defendants' reasonable reliance on BBBY's periodic reporting do not appear on the face of the FAC. The FAC pleads only that the Cohen Defendants relied on BBBY's periodic reporting "[w]hen [they] first disclosed their BBBY position on March 7, 2022." FAC ¶¶ 127-128. That allegation does the Cohen Defendants no good. It does not establish that their reliance was reasonable on March 7, and it does not establish that they relied on BBBY's reporting at all when they made their purchases on March 1, 2, and 3. *See C.R.A. Realty Corp. v. Enron Corp.*, 842 F. Supp. 88, 92 (S.D.N.Y. 1994) (explaining that a Section 16(b) defendant's reliance must be assessed under Rule 13d-1(j) "at the time that the ownership stake was changed," not "at the time of filing"). In short, the FAC pleads no facts that would support the Cohen Defendants' affirmative defense of reasonable reliance on BBBY's periodic reporting. For that reason alone, the Cohen Defendants' motion should be denied.

---

[2] The Cohen Defendants appear to argue that the burden of pleading a defendant's state of mind is smuggled into BBBY's prima facie case by Rule 16a-1(a)(1), which cross-references "section 13(d) of the Act and the rules thereunder." 17 C.F.R. § 240.16a-1(a)(1), *quoted in* Mem. at 18. No authority is cited for this proposition, which the plain terms of the rule belie. As the Cohen Defendants concede, "Rule 16a-1 defines 'beneficial owner,' " Mem. at 18, thereby delimiting the shares to be included in the numerator of the percentage calculation. Nothing in the rule defines the "class of any equity security" or gives any guidance on how to calculate the denominator — the only input the motion disputes. The rule certainly does not impose on the plaintiff the burden of proving defendant's knowledge of the size of the class, nor could it. *See* 15 U.S.C. § 78p(b) (imposing liability "irrespective of any intention on the part of such beneficial owner"); *Olagues*, 866 F.3d at 72; *Adler*, 267 F.2d at 845.

**B.      The FAC Plausibly Alleges the Cohen Defendants Had "Reason to Believe" BBBY's November 2021 Share Count Was Inaccurate in March 2022**

Even if the burden fell to BBBY to plead an absence of reasonable reliance, the FAC easily carries that burden.  The Cohen Defendants' contrary argument that "Plaintiff Does Not Adequately Allege that the Cohen Defendants Knew or Should Have Known that They Beneficially Owned More Than 10% of BBBY's Shares," Mem. at 20, rests on a transparent misreading of Rule 13d-1(j).  The rule denies reliance on an issuer's periodic reporting if an investor "knows or has reason to believe that the information contained therein is inaccurate." 17 C.F.R. § 240.13d-1(j).  Under the rule's plain terms, the FAC does not need to plead that the Cohen Defendants "should have known BBBY's actual outstanding share count."  Mem. at 11. It certainly does not need to plead that they "Knew or Should Have Known that They Beneficially Owned More Than 10%."  *Id.* at 20.  All the FAC needs to plead is that the Cohen Defendants had "reason to believe," by March 1, 2, and 3, 2022, that the November 2021 share count disclosed on January 6 was no longer "[]accurate."  If the Cohen Defendants had ***any*** reason to believe the share count was wrong, the motion fails.  § 240.13d-1(j).

The FAC alleges, with a heap of well-pleaded facts, that the Cohen Defendants had reason to believe the November 2021 share count was inaccurate by early March 2022.  BBBY disclosed on November 2 that it "expect[ed] to repurchase" $400 million in stock "by the end of fiscal 2021," i.e., by February 26.  FAC ¶¶ 138-139.  It publicly confirmed on January 6 that $120 million in stock had been repurchased in the third quarter ended November 27 and that another $275 million would be repurchased by February 26.  *Id.* ¶¶ 139-140.  The trading range for BBBY's common stock during these periods was publicly reported, so by early March the Cohen Defendants could estimate with simple division the minimum number of shares repurchased.  *See id.* ¶¶ 141-146.

-11-

These disclosures went well beyond a generic "'announcement of a stock repurchase program.'" Mem. at 22 (quoting Peter J. Romeo & Alan L. Dye, Section 16 Treatise and Reporting Guide 121 n.80 (6th ed. 2024)). They established not only that a repurchase program had been "announce[d]" but that management was actually carrying through with it, and they detailed the timing and amount of the anticipated repurchases. Under these circumstances, not even the Cohen Defendants' own authority would permit reliance on an issuer's outdated share count. *See* Exchange Act Section 16 and Related Rules and Forms, Compliance & Disclosure Interpretation No. 209.02 (denying reliance on an issuer's reported share count if the investor has "advance awareness of the buy-back and/or its consequences"), *cited in* Mem. at 19-20.

The Cohen Defendants argue that they could not know whether the stock repurchases would "take place on the anticipated timeline or at all." Mem. at 22. In the same vein, they argue that they could not predict "exactly how many shares BBBY would repurchase" because BBBY specified the repurchase program "only in dollars and not in the number of shares." *Id.* at 22-23. These arguments are beside the point because, as explained above, Rule 13d-1(j) does not caveat the Cohen Defendants' reliance on affirmative knowledge about the true share count, the "exact[]" repurchase amount, or the precise "timeline" of repurchases. Reliance is destroyed if the Cohen Defendants had ***any*** "reason to believe" the reported share count was "inaccurate." Any material repurchases at any time between November 27, 2021 and March 1, 2022 would make the share count from the former date inaccurate on the latter date. Once they had "reason to believe" the reported share count was "inaccurate," the Cohen Defendants were legally barred from relying on it regardless of whether they knew the "[]accurate" one.

The Cohen Defendants appeal to the Cooperation Agreement for evidence that their 9.8% beneficial ownership calculation was reasonable, *see* Mem. at 4, 21, but that's a red herring. The

Cooperation Agreement was not made until March 24, 2022, three weeks after the Cohen Defendants made their last purchase of BBBY's equity securities on March 3.  Equally anachronistic is the Cohen Defendants' argument that BBBY subsequently disclosed making a trivial number of stock repurchases after the February 26 end of fiscal 2021.  *See id.* at 23.[3]  As explained earlier, the reasonableness of a Section 16(b) defendant's reliance under Rule 13d-1(j) must be assessed from the information available at the time of his purchases, not at the time of any subsequent disclosure.  *See C.R.A. Realty*, 842 F. Supp. at 92.  None of BBBY's subsequent disclosures about the Cooperation Agreement or the belated completion of its repurchases had any bearing on the information available to the Cohen Defendants on March 1, 2, and 3, 2022.

The Cohen Defendants rely heavily on *C.R.A. Realty*, but that case was decided on summary judgment, not a motion to dismiss.  842 F. Supp. at 89.  The plaintiff there got the same opportunity BBBY seeks here, the opportunity to test the defendants' claims of reasonable reliance with discovery.  *See id.*  The only evidence the *C.R.A. Realty* plaintiff offered to challenge the reasonableness of reliance was the fact that the defendant's security was convertible.  The plaintiff argued that the conversion feature meant that other holders might convert it, thereby decreasing the number of convertible securities outstanding.  *See id.* at 91.

The evidence in *C.R.A. Realty* falls far short of the facts pleaded in the FAC.  Unlike the *C.R.A. Realty* defendant, who could only guess whether shares might be converted, the Cohen Defendants were told outright that BBBY planned to repurchase its stock.  FAC ¶ 138.  Unlike the *C.R.A.* defendant, who had no idea how many shares would be converted or when, the Cohen

---

[3] The Court should not consider the latter argument at all because it depends on the truth of matters outside the pleading.  *See* Dillan Decl. ex. 2 at 4, *cited in* Mem. at 23; *Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007) (holding that a court may consider documents outside the pleading "'only to determine what the documents stated,' and '*not to prove the truth of their contents*'" (quoting *Kramer v. Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir. 1991))).

Defendants were given the timing and volume of BBBY's intended purchases down to the last day and dollar.  *Id.* ¶ 139.  Unlike the *C.R.A.* defendant, whose meager information went unconfirmed, the Cohen Defendants got confirmation from BBBY that it was completing its previously disclosed repurchases on schedule.  *Id.* ¶ 140.

The Eastern District's decision in *In re Luxottica Group S.p.A. Securities Litigation*, 293 F. Supp. 2d 224 (E.D.N.Y. 2003), offers a closer precedent than *C.R.A. Realty*.  The *Luxottica* plaintiff premised a fraud claim on the defendants' failure to file a required Schedule 13D upon acquiring beneficial ownership of more than 5% of the issuer's stock.  The defendants moved to dismiss, arguing that no filing was required because they beneficially owned less than 5% based on the share count in the issuer's most recent report.  *See id.* at 235.  The Court rejected that argument, observing that it "ignores the last sentence of Rule 13d-1(j)."  *Id.*  The defendant had "reason to believe" that the share count was inaccurate because the same quarterly report also disclosed "that Sunglass Hut's Board had authorized a repurchase of 15.5 million shares and that the company had, in fact, started to make those purchases."  *Id.*  The FAC pleads essentially the same facts.  Not only had BBBY disclosed the repurchase of $400 million of its stock between November 2 and February 26, but it informed investors in January 2022 that it "had, in fact, started to make those purchases."  *Id.*

BBBY went even further than that.  On January 6, 2022, the same day it disclosed having 96,337,713 shares outstanding at the end of its third quarter, BBBY told investors that it had also made significant stock repurchases in the fourth quarter.  The Court may take judicial notice that BBBY's January 6 earnings release for the third quarter disclosed that "quarter-to-date" the company had spent "$0.1 billion in capital expenditures and share repurchase activity."  Hunter Decl. ex. A at 3.  The Cohen Defendants were thus on notice, on January 6, 2022, that BBBY

had already spent as much as $100 million buying stock *after* the November 27 share count on which they claim to have relied.

So how could the Cohen Defendants reasonably believe the November 27 share count was "[]accurate" in March 2022 when BBBY told them in January 2022 that it had already spent up to $100 million repurchasing stock *after* November 27?  The simple answer is they couldn't. BBBY's disclosure that it had repurchased up to $100 million of its stock after November 27 destroyed any reasonable reliance on the November 27 share count.

## II.   THE FAC PLAUSIBLY ALLEGES THAT THE COHEN DEFENDANTS REALIZED A SHORT-SWING PROFIT AS BBBY'S STATUTORY DIRECTORS

The Cohen Defendants realized a short-swing profit of more than $47 million upon their sale of BBBY equity securities in August 2022.  FAC ¶¶ 163, 169.  The FAC alleges that the Cohen Defendants were functioning at the time as statutory directors, having deputized the three Cohen Appointees to represent them on BBBY's board.  *Id.* ¶ 170.  The Cohen Defendants challenge this allegation, arguing that the FAC inadequately pleads that the Cohen Appointees served as their board deputies.  Mem. at 14-17.  They also argue that, even if deputization is adequately pled, the FAC must be dismissed because it fails to allege any matchable purchases after the Cohen Appointees joined the board.  *Id.* at 12-14.

The Court does not need to reach either argument if the FAC plausibly alleges that the Cohen Defendants beneficially owned more than 10% of BBBY's common stock between March 1 and August 16, 2022.  The Cohen Defendants made profitable purchases and sales of BBBY's equity securities during that period of less than six months.  *See* FAC ¶ 163.  If the Cohen Defendants were subject to Section 16(b) as 10% beneficial owners during that period, then all of the elements of liability have been properly pled.  *See Olagues*, 902 F.3d at 125.  The Court may then defer the deputization allegations and avoid the far-reaching question of whether

the SEC exceeded its statutory authority in adopting Rule 16a-2(a).  *See, e.g.*, *United States v. Leon*, 766 F.2d 77, 78 (2d Cir. 1985) ("[A] court should decide no more than is necessary.").

Should the Court reach the deputization claim, it should still deny the motion.  The FAC adequately pleads both that the Cohen Appointees functioned as the Cohen Defendants' board deputies and that the latter realized a recoverable short-swing profit while the Cohen Appointees served on their behalf.

### A.    The FAC Plausibly Alleges That the Cohen Defendants Acted as BBBY's Directors by Deputization Through the Cohen Appointees

The Act defines a "director" as "any director of a corporation *or any person performing similar functions*." 15 U.S.C. § 78c(a)(7) (emphasis added).  The Supreme Court has held that the italicized language extends the definition to include persons who function as directors by deputizing someone to represent them on the issuer's board.  *See Blau v. Lehman*, 368 U.S. 403, 410 (1962) ("Lehman Brothers would be a 'director' of Tide Water, if as petitioner's complaint charged Lehman actually functioned as a director through Thomas, who had been deputized by Lehman to perform a director's duties not for himself but for Lehman.").  Since the Act defines a "person" to include a "company," it follows that these so-called "directors by deputization" may include natural persons as well as companies like RC Ventures.  15 U.S.C. § 78c(a)(9); *see also Roth v. Perseus, L.L.C.*, 522 F.3d 242, 246 (2d Cir. 2008) ("[A] corporation, partnership, trust or other person can be deemed a director . . . ." (internal quotation marks omitted)).

*Lehman* recognized the deputization doctrine but gave little guidance on how to apply it, leaving the lower courts to develop the doctrine ad hoc.  *See* Romeo & Dye, *supra*, at 225-34 (discussing cases).  The upshot of these cases is that "[w]hether a person is serving on an issuer's board of directors as another entity's deputy is a question of fact to be determined on a case-by-case basis."  *Id.*; *see also Feder v. Martin Marietta Corp.*, 406 F.2d 260, 263 (2d Cir. 1969)

(calling deputization "a question of fact to be settled case by case and not a conclusion of law").

The fact-sensitive nature of the inquiry makes it ill-suited to a motion to dismiss: in the 60 years

since *Lehman*, no court has ever dismissed a deputization claim under Rule 12(b)(6).[4]

The leading treatise has distilled from the case law a five-factor test for deputization.

Romeo & Dye, *supra*, at 234-35.  According to this test, the Court should consider whether:

- **[Factor 1]** The entity recommended the director for election or appointment to the board;

- **[Factor 2]** The entity recommended the director for the purpose of protecting or representing the entity's interests rather than for the purpose of guiding or enhancing the issuer's business activities;

- **[Factor 3]** The director regularly gained access to material nonpublic information about the issuer;

- **[Factor 4]** The director shared the confidential information with the entity; and

- **[Factor 5]** The entity used the information to inform its investment strategy regarding the issuer's securities.

*Id*.  Even if BBBY were required to adequately plead all five facts to state a claim under

Rule 12(b)(6),[5] the FAC easily clears that bar.

---

[4] The plaintiff lost on Rule 12(b)(6) in *Rubenstein v. International Value Advisers, LLC*, but the deputization argument was not raised until appeal, and the Second Circuit declined to reach it.  959 F.3d 541, 550-51 (2d Cir. 2020).  The deputization claim in *Feder* was dismissed only after trial, and that decision was reversed.  286 F. Supp. 937, 940 n.4, 948 (S.D.N.Y. 1968), *rev'd*, 406 F.2d 260.

[5] The treatise characterizes the five facts as "minimum" requirements for deputization, a characterization the Cohen Defendants enthusiastically endorse.  *See* Romeo & Dye, *supra*, at 234; Mem. at 2, 12, 14, 17.  In fact, no case has treated any one fact, much less all five, as indispensable.  Courts treat them as "factors to consider" rather than necessary conditions.  *See Roth v. Armistice Cap., LLC*, No. 20-cv-8872 (JLR), 2024 U.S. Dist. LEXIS 56887, at *32 n.4 (S.D.N.Y. Mar. 27, 2024) ("Courts consider various factors . . . , including . . . ."); *Calenture, LLC v. Pulte*, No. 21-cv-402 (PKC), 2022 U.S. Dist. LEXIS 57538, at *10 (S.D.N.Y. Mar. 29, 2022) ("five factors to consider"); *Revive Investing LLC v. Armistice Cap. Master Fund, Ltd.*, No. 20-cv-2849-CMA-SKC, 2023 U.S. Dist. LEXIS 153523, at *27 (S.D.N.Y. Aug. 30, 2023) ("relevant factors that the Court should consider").  Cases have found deputization even in the

### 1. The FAC Adequately Pleads That the Cohen Appointees Were Appointed to Represent the Cohen Defendants' Interests (Factors 1-2)

The Cohen Defendants argue that the FAC inadequately alleges that they recommended the Cohen Appointees to BBBY's board for the purpose of protecting the Cohen Defendants' interests. Mem. at 15. That argument is, put simply, preposterous. A Cohen Appointee is alleged to have announced on his first day of work that "I will be representing Ryan as if I owned the 10% myself." FAC ¶ 41. The appointee told another roomful of executives later that day that "Ryan does not want to be on the board — [he] wants directors on as indirect proxy." *Id.* ¶ 42. Admissions like these are the "smoking gun" of deputization. *See* Romeo & Dye, *supra*, at 236 ("Rarely is there a smoking gun of the type that existed in the *Feder* case, in the form of Bunker's letter of resignation expressly stating that he had been representing Martin Marietta's interests on Sperry's board.").

And this "smoking gun" is not even the only relevant fact pled. The FAC also pleads that Cohen handpicked the Cohen Appointees and had them installed on the board, FAC ¶ 24; that he needed "prox[ies]" only because he lacked the time to join the board himself, *id.* ¶¶ 39, 42; that the Cohen Appointees urged the board to give Cohen more influence and access, *id.* ¶¶ 44-47; that the Cohen Appointees worked to arrange meetings between Cohen and management and get him access to earnings releases and other material nonpublic information, *see id.* ¶¶ 62-74; that the Cohen Appointees reported back to Cohen in private conversations about the goings-on at

---

absence of one or more factors. In *Feder*, for example, the Second Circuit ordered summary judgment for plaintiff despite undisputed evidence that the director joined the board at the invitation of the issuer rather than on the investor's recommendation. 406 F.2d at 264; *accord Revive*, 2023 U.S. Dist. LEXIS 153523, at *28.

The Court does not need to decide whether the five facts are required elements or factors to be weighed if it agrees that all five are adequately pled.

BBBY, *see id.* ¶¶ 58-61; that the Cohen Appointees caucused separately from the rest of the board, acting more like a delegation than three independent fiduciaries, *id.* ¶ 53; that during one of these caucuses, one Cohen Appointee exhorted another to "[f]ollow Ryan's playbook," *id.* ¶ 55; that a Cohen Appointee did damage control for Cohen, urging BBBY to release a statement exculpating him from any wrongdoing in selling his shares, *see id.* ¶¶ 111-114; and that most of the Cohen Appointees departed the board soon after the Cohen Defendants sold their stock, with two of them not even completing the full term for which they were appointed, *id.* ¶ 100.  From this mountain of well-pleaded facts, the Court may reasonably and easily infer that the Cohen Appointees were recommended to protect the Cohen Defendants' interests.

### 2.    The FAC Adequately Pleads That the Cohen Defendants Used Material Nonpublic Information Obtained from the Cohen Appointees to Inform Their Investment Strategy (Factors 3-5)

The Cohen Defendants challenge the adequacy of the FAC's allegation that they used material nonpublic information from the Cohen Appointees to inform their investment strategy. Mem. at 15-17.  They have already lost this challenge once.  *See In re Bed Bath & Beyond Corp. Sec. Litig.*, 687 F. Supp. 3d 1 (D.D.C. 2023).  The plaintiff in that case accused the Cohen Defendants of insider trading in connection with their August 2022 sales of BBBY stock.  The Cohen Defendants moved for dismissal, but Judge McFadden refused:

> [The Complaint] plausibly alleges that Cohen was privy to material adverse information that was nonpublic.  Most glaringly, Cohen's Cooperation Agreement with Bed Bath "acknowledged that Cohen would receive material, nonpublic information."
>
> Plus, the timing of Cohen's trades was sketchy.  He dumped his entire stake on August 16 and 17.  Shortly after, the following became public:
>
> - Bed Bath was failing to pay suppliers (August 19).
>
> - Bed Bath was firing 20% of its employees and closing 150 stores (August 31).

- Bed Bath was not going to sell buybuy BABY (August 31).

- Bed Bath's investment rating was downgraded (September 1).

Cohen just barely beat this bad news, which suggests that he saw it coming. Plus, Cohen had access to Bed Bath's board. And he handpicked three of its members. Finally, he spoke with Bed Bath's CFO and "other executives." So Cohen plausibly traded on material, adverse, and nonpublic information.

*Id.* at 14-15 (citations omitted). The FAC alleges the same facts. *See* FAC ¶¶ 108-109. Those allegations are as plausible here as they were in Judge McFadden's courtroom.

The FAC goes even further. To buttress its allegation that the Cohen Defendants used material nonpublic information obtained from the Cohen Appointees, the FAC pleads that the Cohen Appointees actually and avowedly understood themselves as serving the Cohen Defendants' interests, *see, e.g.*, FAC ¶¶ 40-42, 53-55; that they communicated privately with Cohen on at least five occasions, *id.* ¶¶ 59, 61; that one of them admitted giving Cohen confidential information of plausible materiality, *id.* ¶ 60; that they were motivated to get Cohen material nonpublic information, as evidenced by the fact that they repeatedly urged BBBY to give it to him, *see id.* ¶¶ 44-49; and that the Cohen Appointees were the most likely source of any tips, since the rest of BBBY's management disliked and mistrusted Cohen, *see id.* ¶¶ 118-119, 122. No court has ever rejected a deputization claim on facts like these.

The Cohen Defendants insist that director Rosenzweig swore he had never given them material nonpublic information, Mem. at 17, but that's not true. Rosenzweig admitted giving Cohen nonpublic information about the interpersonal dynamics of BBBY's board; his testimony merely "downplay[ed] the information's materiality." FAC ¶ 60. An opinion on materiality lay beyond the ken of a lay witness, and the information was plausibly material in any event. The board was just a few weeks away from turning on one of its own, CEO Mark Tritton, whose termination helped send the stock nosediving more than 20%. *See id.* ¶¶ 64-65.

Equally baseless is the argument that "the other BBBY directors rejected the [Cohen Appointees'] alleged recommendation to share more information with Mr. Cohen." Mem. at 16. On the contrary, the FAC specifically alleges that the board gave Cohen advance warning of Tritton's ouster and its disastrous Q1 2022 earnings "at the insistence of director Rosenzweig." *See* FAC ¶¶ 66-68. The Cohen Defendants also ignore the FAC in arguing that "Cohen repeatedly stated that he did not want material nonpublic information." Mem. at 16. They overlook that Cohen repeatedly probed for the information he made a show of spurning and gladly accepted any intel offered. *See* FAC ¶¶ 78-82, 84-90. They also overlook Cohen's April 2022 email to board chair Edelman, which asked for her views on strategy and warned her "[t]his is a partnership now and it shouldn't be a one-way conversation." *Id.* ¶ 77 & ex. F.

The Cohen Defendants resort at last to labels and conclusions, calling the suggestion that Cohen misused inside information "pure conjecture from a television personality and cryptic reactions of certain BBBY employees." Mem. at 17. This dubious defense reduces to the proposition that Cohen's misconduct was plausible only in the eyes of those who observed or worked with him. Evidently, the only persons who did not mistrust the Cohen Defendants were the Cohen Appointees — a fact that rather suggests their representative function on his behalf.

### B.    A Statutory Director Must Disgorge the Short-Swing Profit from His Sale of Issuer Stock Even if the Matching Purchase Preceded His Directorship

The Cohen Defendants argue that, even if they plausibly qualified as BBBY's directors by deputization, they cannot be liable under Section 16(b) because their last purchase was made before the Cohen Appointees joined BBBY's board. *Id.* at 12-13. They cite Rule 16a-2(a), which generally exempts from Section 16 any "transaction(s) carried out by a director or officer in the six months prior to the director or officer becoming subject to section 16." 17 C.F.R. § 240.16a-2(a). The argument lacks merit because the rule exceeds the SEC's exemptive

authority, having been adopted in contravention of the statutory text.

Section 16(b) authorizes the SEC to exempt by rule "any transaction or transactions . . . not comprehended within the purpose of this subsection."  15 U.S.C. § 78p(b).  The SEC purported to exercise this authority in adopting Rule 16a-2(a) in 1991.  *See* Ownership Reports and Trading by Officers, Directors and Principal Security Holders, Exchange Act Release No. 34-28869, 56 Fed. Reg. 7242, 7244 (Feb. 21, 1991).  The Court has previously cited the rule in dismissing a complaint against directors whose stock purchases were made before their directorships.  *See Gryl v. Shire Pharms. Group PLC*, No. 00 CV 9173 (HB), 2001 U.S. Dist. LEXIS 13371, at *7 (S.D.N.Y. Aug. 30, 2001), *aff'd*, 298 F.3d 136 (2d Cir. 2002).

Rule 16a-2(a) overruled a contrary decision of the Second Circuit.  *Adler v. Klawans*, 267 F.2d 840 (2d Cir. 1959).  *Adler* squarely held that "Section 16(b) is applicable to a short swing transaction even though the person involved was a director only at the time of the sale and not at the time of the purchase."  *Id.* at 847.  *Adler*'s reasoning relied on the last line of Section 16(b), a proviso that "[t]his subsection shall not be construed to cover any transaction where such beneficial owner was not such both at the time of the purchase and sale."  15 U.S.C. § 78p(b), *quoted in Adler*, 267 F.2d at 843.  Because the proviso singles out 10% beneficial owners for a more limited basis of liability, the *expressio unius* canon dictates that the same limitation must not apply to directors and officers.  *Adler*, 267 F.2d at 845.

*Adler* posed without deciding whether the SEC had the power to exempt a director's transactions in the six months prior to his directorship.  *Id.* at 847.  That question was answered last Term by *Loper Bright Enterprises v. Raimondo*, 144 S. Ct. 2244 (2024).  *Loper* held that "the interpretation of the meaning of statutes, as applied to justiciable controversies, [is] exclusively a judicial function," even when the statute is ambiguous.  *Id.* at 2258 (cleaned up).

The decision overruled *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984), which *Loper* criticized as inconsistent with the APA.  The Court was especially critical of *Chevron* for allowing agency regulations to overrule prior court decisions, a usurpation of the judicial power that the Court called "the antithesis of the time honored approach the APA prescribes."  144 S. Ct. at 2265; *see also id.* ("[*Chevron*] demands that courts mechanically afford *binding* deference to agency interpretations . . . . even when a pre-existing judicial precedent holds that the statute means something else . . . .").  This usurpation is exactly what Rule 16a-2(a) accomplished when it overruled *Adler*, and *Loper* has now put an end to it.

When the Stockholder Suits challenged Rule 16a-2(a) in 2023, the Cohen Defendants offered no defense for it other than *Chevron* deference.  *See* Hunter Decl. ex. B at 26-29.  Even though *Loper* cut the ground out from their one defense, the motion offers no new argument for the rule's validity.  The Cohen Defendants should not be heard to offer a new one now, since "[i]t is well established that [the Court] will not consider an argument raised for the first time in a reply brief."  *Katz v. Comodo Holdings, Ltd.*, No. 13 Civ. 2585 (NRB), 2014 U.S. Dist. LEXIS 39643, at *18 (S.D.N.Y. Mar. 18, 2014) (Buchwald, J.) (internal quotation marks omitted).

Nor can Rule 16a-2(a) be defended under stare decisis.  While *Loper* will "not call into question prior cases that relied on the *Chevron* framework," 144 S. Ct. at 2273, BBBY can find no case (and the Cohen Defendants cite none) that actually applied *Chevron* to the rule.  The one case cited by the Cohen Defendants mentioned the rule only in dicta.  *See Gryl v. Shire Pharms. Grp. PLC*, 298 F.3d 136, 141 & n.3 (2d Cir. 2002), *cited in* Mem. at 13.  The rule has never survived *Chevron* analysis,[6] and it can't survive after *Loper*.

---

[6] While *Loper* sounds the death knell for Rule 16a-2(a), the rule could not have withstood *Chevron* scrutiny anyway.  *Adler* ostensibly found an ambiguity in Section 16(b)'s treatment of transactions in advance of a directorship, *see* 267 F.2d at 844, but it went on to resolve that

*Loper* held that the "best reading" of a statute is "'the reading the court would have reached' if no agency were involved." *Id.* at 2266 (quoting *Chevron*, 467 U.S. at 843 n.11). We know the best reading of Section 16(b) because the *Adler* Court reached it before the SEC got involved. According to *Adler*, the best reading is that a director's purchase before his directorship *is* "comprehended within the purpose of this subsection" if followed less than six months later by a profitable sale during the directorship. 15 U.S.C. § 78p(b). Under *Loper*, that statutory construction controls, and the SEC had no power to overturn it with Rule 16a-2(a). The rule exceeds the SEC's rulemaking authority and cannot support the Cohen Defendants' motion.

## III.   AN AFFIRMATIVE DEFENSE UNDER SECTION 23(a) OF THE ACT FINDS NO SUPPORT IN THE FAC AND CANNOT SUSTAIN A MOTION TO DISMISS

Finally, the Cohen Defendants argue that Section 23(a) of the Act absolves their liability because they acted "'in good faith in conformity with'" SEC rules. Mem. at 24-25 (quoting 15 U.S.C. § 78w(a)(1)). Because bad faith does not form one of the elements of Section 16(b)'s strict liability, good faith conformity with SEC rules would afford at best an affirmative defense for the Cohen Defendants to plead and prove. *Contra* Mem. at 25 (baselessly demanding "well-pled allegations of bad faith"). That defense cannot be resolved on a motion to dismiss because the FAC does not plead the elements of the defense on its face. *See Kirschner*, 87 F.4th at 142.

The FAC alleges that the Cohen Defendants did not conform their conduct to Rule 13d-1(j) at all, much less conform it "in good faith." As explained earlier, *see supra* Section I.B, the

---

ambiguity using the *expressio unius* canon. The Court concluded that the congressional "objectives" that "supply the key to the resolution of whatever ambiguity can be argued" were "clear from the language of the statute." *Id. Chevron* would later hold that a statute is not ambiguous if its meaning can be discerned with "traditional tools of statutory construction." 467 U.S. at 843 n.9. Since *Adler* discerned the meaning of Section 16(b) using traditional tools of statutory construction, no ambiguity remained for the SEC to resolve, and Rule 16a-2(a) could not have passed *Chevron*'s first step even before *Loper*.

Cohen Defendants disregarded the rule's last sentence, relying on BBBY's reported share count despite having "abundant reason to know [the share count] was stale."  FAC ¶ 129.

Rule 16a-2(a) cannot support a Section 23(a) defense either because the Cohen Defendants did not rely on the rule.  The "good faith . . . conformity" demanded by Section 23(a) requires actual reliance, not post hoc rationalization.  *See Greene v. Dietz*, 247 F.2d 689, 695 (2d Cir. 1957) (upholding a Section 23(a) defense because of "the defendants' exculpatory reliance . . . on the rule itself"); *Perlman v. Timberlake*, 172 F. Supp. 246, 258 (S.D.N.Y. 1959) ("The purpose of the Section is to permit regulations to protect persons who rely on them . . . ."); Romeo & Dye, *supra*, at 968 ("The foundation for a Section 23(a)(1) defense is a showing that the defendant relied 'in good faith' on a Commission rule, regulation, or order.").  The FAC never alleges that the Cohen Defendants relied on Rule 16a-2(a) to exempt their purchases before their directorship.  To this day, the Cohen Defendants deny even being directors.  *See* Mem. at 14-17.  The Cohen Defendants cannot claim to have "conform[ed]" their conduct to the rule as directors while simultaneously claiming that they never conducted themselves as directors at all.

## CONCLUSION

The motion to dismiss should be denied.

Dated: January 13, 2025

Respectfully submitted,

/s/ James A. Hunter
James A. Hunter
LAW OFFICE OF JAMES A. HUNTER
201 King of Prussia Road, Suite 650
Radnor, Pennsylvania  19087
Phone: +1 (484) 275-2162
Fax:    +1 (646) 462-3356
Email: hunter@hunterkmiec.com

*Counsel for Plaintiff 20230930-DK-Butterfly-1,*
*Inc., f/k/a Bed Bath & Beyond Inc.*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

20230930-DK-BUTTERFLY-1, INC., f/k/a
BED BATH & BEYOND INC.,

     Plaintiff,

        – v. –

RYAN COHEN and
RC VENTURES LLC,

     Defendants.

---

ECF CASE

No. 24-cv-5874 (NRB)

### CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing document complies with the word limit of Local Civil Rule 7.1(c) because, excluding its exempted parts, the document contains 8,655 words as counted by Microsoft Office.

Dated: January 13, 2025

/s/ James A. Hunter
James A. Hunter
LAW OFFICE OF JAMES A. HUNTER
201 King of Prussia Road, Suite 650
Radnor, Pennsylvania  19087
Phone: +1 (484) 275-2162
Fax:    +1 (646) 462-3356
Email: hunter@hunterkmiec.com

*Counsel for Plaintiff 20230930-DK-Butterfly-1,*
*Inc., f/k/a Bed Bath & Beyond Inc.*