JAMES A HUNTER
ATTORNEY AT LAW

201 KING OF PRUSSIA ROAD, SUITE 650
RADNOR, PENNSYLVANIA 19087

TELEPHONE (484) 275-2162
FACSIMILE (646) 462-3356

September 17, 2026

***BY ECF***

The Honorable Naomi Reice Buchwald
The United States District Court, S.D.N.Y.
500 Pearl Street
New York, New York 10007-1312

**Re: *20230930-DK-Butterfly-1, Inc. v. Cohen et al.*, No. 24-cv-5874 (NRB)**

Dear Judge Buchwald:

Plaintiff 20230930-DK-Butterfly-1, Inc., f/k/a Bed Bath & Beyond Inc. ("BBBY"), respectfully responds to the pre-motion letter filed by Defendants Ryan Cohen and RC Ventures LLC (collectively, the "Cohen Defendants"). Dkt. 58. BBBY does not oppose the Cohen Defendants' request for a pre-motion conference. The proposed motion itself fails to establish the Cohen Defendants' entitlement to summary judgment and should be denied.

**I. A Reasonable Jury Could Find That the Cohen Defendants Had "Reason to Believe" the November 2021 Share Count Was Inaccurate by March 2022**

The proposed motion rests on the canard, exhumed from the Cohen Defendants' motion to dismiss, that BBBY did no more on November 2, 2021 than "publicly announce[] the repurchase program." Dkt. 58 at 2; *see also id.* ("*Standing alone*, that announcement is insufficient as a matter of law." (emphasis added)); *id.* at 3 ("merely from the announcement of a repurchase program"). The Court has already rejected that premise, observing that "BBBY did far more than announce its share repurchase program." Dkt. 32 at 17. The information BBBY disclosed on November 2 included the volume of the expected repurchases ($400 million) and their timing (by February 26). BBBY confirmed on January 6 that the accelerated program was on track, announcing that $120 million of stock had been bought in the third quarter and that another $275 million would be bought by February 26. The January 6 earnings release also disclosed that $100 million had been spent on "capital expenditures and share repurchase activity" just in the weeks since November 27.

From the bundling of "capital expenditures" with "share repurchase[s]," the Cohen Defendants fantasize that maybe all $100 million was spent on capex and $0 on buybacks. *See* Dkt. 58 at 1–2 ("[The January 6 report] did not disclose how many shares, *if any*, had been purchased between November 2021 and the date of the report." (emphasis added)). Even if that fanciful inference could be drawn, a reasonable jury would not have to draw it. The competing (and correct) inference, that some material number of shares was retired from that $100 million, easily clears the bar of reasonableness. That reasonable inference must be drawn in BBBY's favor. *See, e.g.*, *Nick's Garage, Inc. v. Progressive Cas. Ins.*, 875 F.3d 107, 113 (2d Cir. 2017).

Then there's the problem of the math. BBBY's fiscal year had already ended when the Cohen Defendants made their last purchases in early March 2022. At that point, the Cohen Defendants could calculate the approximate reduction in the share count just by looking at the stock's trading range over the announced term of the buybacks. As the Court observed in deciding the Rule 12(b)(6) motion, $395 million worth of stock repurchases between November 2 and February 26 would have lifted the Cohen Defendants over 10% even if every dollar had been spent at the stock's peak of $25.72 per share. Dkt. 32 at 17–18 & n.14.

The foregoing facts were alleged in the complaint and have been confirmed in discovery. BBBY will support those facts with records, affidavits, and admissions sufficient to show that the facts can be reduced to admissible evidence. Fed. R. Civ. P. 56(c)(1)(A), (c)(2). With all reasonable inferences drawn in BBBY's favor, this record will raise at least a triable claim that the Cohen Defendants had "reason to believe" the November 2021 share count was inaccurate by March 2022.

## II. None of the Cohen Defendants' Authorities Support Their Motion

The authorities cited by the Cohen Defendants do not support their motion and in fact tend to undermine it. Their marquee case declined to subject Goldman Sachs to Section 16(b) in the absence of "publicly available information that would have indicated to Goldman that it had crossed [Enron's] ten percent threshold." *C.R.A. Realty Corp. v. Enron Corp.*, 842 F. Supp. 88, 91 (S.D.N.Y. 1994), *cited in* Dkt. 58 at 2. But as this Court has recognized, *see* Dkt. 32 at 18–19, the Cohen Defendants knew far more about BBBY's share count than Goldman knew about Enron's. Goldman knew only that the convertible preferred stock it held was also held by other investors. 842 F. Supp. at 89. It had no idea whether the other investors would convert their stock, much less when they would do so or in what amounts. Enron had no foreknowledge of these facts either and made no disclosure of them.

BBBY disclosed all of this. It told investors it planned to retire $400 million of stock by February 26, 2022, and it updated investors in January to confirm purchases were being made. The Cohen Defendants could infer the minimum number of shares retired by looking at the ticker tape. In this Court's words, "there appears to have been ample publicly available information that would have indicated to the Cohen defendants that they had crossed the ten percent ownership threshold in March 2022." Dkt. 32 at 18–19. That appearance has been confirmed in discovery, and a reasonable jury could easily conclude that this "ample publicly available information" gave the Cohen Defendants "reason to believe" that the last published share count was inaccurate by early March 2022. 17 C.F.R. § 240.13d-1(j).

The treatise and staff guidance cited by the Cohen Defendants do not support the motion either. The Cohen Defendants invoke this authority as proof that the "'announcement of a stock repurchase program is not enough to charge a person with knowledge'" of insider status. Dkt. 58 at 3 (quoting Peter J. Romeo & Alan L. Dye, Section 16 Treatise and Reporting Guide § 2.03(3)(j)(iv) n.80); *see also id.* ("Romeo & Dye cites *C.R.A. Realty* and the SEC guidance . . . ."). But this argument starts from a false premise: BBBY did ***not*** "announce[] . . . a stock

repurchase program" in November 2021. The program had been announced back in 2020. What BBBY disclosed in November 2021 was an abrupt and aggressive acceleration of that previously announced program. The November 2021 disclosure told investors how much would be spent and when, and the Cohen Defendants could infer the minimum number of shares retired from the trading data. The treatise and the staff guidance actually cut against the Cohen Defendants on these facts. *See* Romeo & Dye, *supra*, § 2.03(3)(j)(iv) n.80 ("The SEC staff has expressed the view that, where a person is aware both that an issuer repurchase of stock will occur and that the repurchase will make the person a ten percent owner, the person becomes an insider when the repurchase occurs." (citing Exchange Act Section 16 and Related Rules and Forms, Compliance & Disclosure Interpretation No. 209.02)), *cited in* Dkt. 58 at 3.

The motion is further undercut by the Eastern District's decision in *In re Luxottica Group S.p.A., Securities Litigation*, 293 F. Supp. 2d 224 (E.D.N.Y. 2003). The defendant there had "reason to believe" a share count was inaccurate because the issuer simultaneously disclosed that the board "had authorized a repurchase of 15.5 million shares and that the company had, in fact, started to make those purchases." *Id.* at 235. The disclosure of BBBY's buyback was even more detailed. BBBY disclosed both the size of the repurchases and a short and specific window for their completion, and it later confirmed that the repurchases were underway. From the information BBBY gave, the Cohen Defendants could infer that they had crossed the 10% line before completing their last BBBY purchases in early March.

The Cohen Defendants try to distinguish *Luxottica* as a Section 10(b) case, Dkt. 58 at 3, but that's no distinction at all. The *Luxottica* court's analysis of the fraud claim relied on the language of Rule 13d-1(j). *See* 293 F. Supp. 2d at 235. The meaning of that language does not change just because it's applied to a claim under Section 16(b) rather than Section 10(b). Equally unpersuasive is the Cohen Defendants' attempt to recast *Luxottica* as "dicta." Dkt. 58 at 3. The court's application of Rule 13d-1(j) drove its conclusion that "defendants have not demonstrated that, as a matter of law, the failure to file a Schedule 13D . . . was not in violation of Section 10(b)[]." 293 F. Supp. 2d at 235. The fact that the plaintiff lost at a later step of the analysis does not transform the anterior reasoning into dicta. *See, e.g.*, *Retail Prop. Trust v. Nassau County*, 185 F.4th 316, 326 (2d Cir. 2026) ("[W]hen we address a threshold issue, we do not create dicta just because we theoretically *could* have assumed the answer to that question without deciding it."). As in *Luxottica*, the language of Rule 13d-1(j) makes it impossible for the Cohen Defendants to establish their defense "as a matter of law."

## III. Conclusion

The proposed motion is not supported by the facts or law. Because the Cohen Defendants cannot show "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law," Fed. R. Civ. P. 56(a), the motion should be denied.

Respectfully submitted,

/s/ James A. Hunter

Copies by ECF: All Counsel of Record