**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

20230930-DK-BUTTERFLY-1, INC., f/k/a BED BATH & BEYOND INC.,

Plaintiff,

v.

RYAN COHEN and RC VENTURES LLC,

Defendants.

Case No. 1:24-cv-05874-NRB

**DEFENDANTS RYAN COHEN AND RC VENTURES LLC'S MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**

WOLLMUTH MAHER & DEUTSCH LLP

Joshua M. Slocum
Maxwell G. Dillan
Jocelyn M. Stuto
500 Fifth Avenue
New York, New York 10110
Phone: (212) 382-3300
jslocum@wmd-law.com
mdillan@wmd-law.com
jstuto@wmd-law.com

*Attorneys for Defendants Ryan Cohen and RC Ventures LLC*

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ........................................................................................1

FACTUAL BACKGROUND ........................................................................................3

A. The Parties ........................................................................................3

B. Timeline of Relevant Events ........................................................................................3

1. BBBY announces the expected completion of its share repurchase program by end of fiscal 2021. ........................................................................................3

2. BBBY discloses its outstanding share count on January 6, 2022. .............4

3. The Cohen Defendants purchase BBBY shares between January 13 and March 3, 2022 and rely on advice from experienced counsel to stay under the 10% threshold. ........................................................................................5

4. After the purchases are complete, BBBY represents the Cohen Defendants beneficially owned 9.8% of outstanding shares. .....................8

5. BBBY discloses a new outstanding share count on April 13, 2022. ...........9

6. The Cohen Defendants sell their BBBY shares in August 2022. ..............10

7. BBBY rejects shareholder demands to bring Section 16(b) claims because the Cohen Defendants were entitled to rely on its January 6, 2022 share count disclosure. ........................................................................................11

PROCEDURAL HISTORY ........................................................................................12

LEGAL STANDARD ........................................................................................13

A. Summary Judgment ........................................................................................13

B. Section 16(b) ........................................................................................13

ARGUMENT ........................................................................................14

I. The Cohen Defendants did not beneficially own more than 10% when they bought BBBY stock. ........................................................................................15

A. Rule 13d-1(j) permits investors to rely on the issuer's last disclosed share count to determine their beneficial ownership percentage unless they know or have reason to believe it is inaccurate ........................................................................................15

B. The Cohen Defendants cannot be deemed more than 10% beneficial owners because they neither knew nor had reason to believe the November 27, 2021 share count was inaccurate. ....16

1. No public disclosure revealed or allowed anyone to calculate the number of shares BBBY repurchased after November 27, 2021. ....16

2. It was impossible for the Cohen Defendants to otherwise obtain information about BBBY's repurchase activity. ....17

3. The Cohen Defendants' awareness of BBBY's caveated estimate of planned repurchases did not provide reason to believe the reported count was inaccurate. ....19

4. Plaintiff's theory would impose a new, unworkable rule on investors, contrary to precedent. ....21

C. *C.R.A. Realty* fully applies on this record because the Cohen Defendants had no way of knowing they crossed the 10% threshold. ....24

II. Even if Section 16(b)'s short-swing profit rule applied, Section 23(a) provides safe harbor for the Cohen Defendants' good-faith conformity with SEC regulations. ....26

CONCLUSION ....27

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*20230930-DK-Butterfly-1, Inc. v. HBC Investments LLC*,
180 F.4th 490 (2d Cir. 2026) .......... 23-24

*Aldrich v. Randolph Cent. Sch. Dist.*,
963 F.2d 520 (2d Cir. 1992) .......... 13

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) .......... 13

*Beard v. Banks*,
548 U.S. 521 (2006) .......... 13

*C.R.A. Realty Corp. v. Enron Corp.*,
842 F. Supp. 88 (S.D.N.Y. 1994) .......... *passim*

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986) .......... 13

*Chechele v. Scheetz*,
819 F. Supp. 2d 342 (S.D.N.Y. 2011) .......... 13

*Clarus Corp. v. HAP Trading, LLC*,
770 F. Supp. 3d 668 (S.D.N.Y. 2025) .......... 14

*Colema Realty Corp. v. Bibow*
555 F. Supp. 1030 (D. Conn. 1983) .......... 26-27

*Foremost-McKesson, Inc. v. Provident Sec. Co.*,
423 U.S. 232 (1976) .......... 14

*Gerstle v. Gamble-Skogmo, Inc.*,
478 F.2d 1281 (2d Cir. 1973) .......... 26

*Gollust v. Mendell*,
501 U.S. 115 (1991) .......... 14

*Greene v. Dietz*
247 F.2d 689 (2d Cir. 1957) .......... 26

*Gwozdzinsky v. Zell/Chilmark Fund, L.P.*,
156 F.3d 305 (2d Cir. 1998) .......... 13

*In re Luxottica Grp. S.p.A. Sec. Litig.*,
293 F. Supp. 2d 224 (E.D.N.Y. 2003) .......... 25

*Levy v. Southbrook Int'l Invs., Ltd.*,
263 F.3d 10 (2d Cir. 2001) .......... 15

*Lewis v. Varnes*,
505 F.2d 785 (2d Cir. 1974) .......... 14

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
475 U.S. 574 (1986) .......... 13

*Olagues v. Perceptive Advisors LLC*,
902 F.3d 121 (2d Cir. 2018) .......... 14, 23

*Reliance Elec. Co. v. Emerson Elec. Co.*,
404 U.S. 418 (1972) .......... 14

*Roth ex rel. Beacon Power Corp. v. Perseus L.L.C.*,
522 F.3d 242 (2d Cir. 2008) .......... 14

**Statutes**

15 U.S.C. § 78p(b) .......... 15

15 U.S.C. § 78w(a)(1) .......... 26

**Rules**

Fed. R. Civ. P. 56(a) .......... 13

Fed. R. Civ. P. 56(e) .......... 13

**Regulations**

17 C.F.R. § 240.13d-1(j) .......... *passim*

17 C.F.R. § 240.16a-1(a)(1) .......... 15

*Modernization of Beneficial Ownership Reporting*,
87 Fed. Reg. 13846 (proposed Mar. 10, 2022) .......... 19

*Ownership Reports & Trading by Officers, Directors & Principal Sec. Holders*,
56 Fed. Reg. 7242 (Feb. 21, 1991) .......... 23

**Other Authorities**

*In the Matter of Sec. Cap. Rsch. & Mgmt. Inc.*,
Exchange Act Release No. 73063 (Sept. 10, 2014)............................................................ 22

Peter J. Romeo & Alan L. Dye,
*Section 16 Treatise and Reporting Guide* (6th ed. 2024) ................................................20, 22

SEC Division of Corporation Finance, Compliance and Disclosure Interpretations,
Exchange Act Section 16 and Related Rules and Forms, Interp. 209.02 (May 23, 2007) .. 19-20

## PRELIMINARY STATEMENT

This Section 16(b) short-swing profits case turns on whether the Cohen Defendants held more than 10% of BBBY's outstanding shares when they bought BBBY stock. They started buying BBBY stock in January 2022 and made their last purchase on March 3, 2022. It is undisputed that, based on BBBY's last-disclosed share count during this period, they held only 9.8% when they bought their last share. That means the short-swing profit rule does not apply and this case fails.

Plaintiff claims that BBBY's last-disclosed share count does not control because BBBY was executing a share repurchase program, reducing the outstanding shares, and, as a result, the Cohen Defendants had "reason to believe" the last-disclosed share count was inaccurate. The case law and SEC interpretive guidance construing the governing SEC regulations uniformly contradict Plaintiff's argument. They confirm that an investor has no affirmative obligation to corroborate the issuer's disclosed share count; an investor may rely on the last-disclosed share count unless the investor has advance awareness of actual repurchase transactions that the investor knows will push him or her over the 10% threshold; and where the investor has no way of knowing that such transactions occurred, Section 16 does not apply.

After extensive discovery, the undisputed factual record confirms that when the Cohen Defendants were buying shares, they had no advance awareness and no possible way to know whether BBBY had repurchased shares, let alone when or how many, so they could not have known they were pushed over the threshold. Plaintiff's Rule 30(b)(6) witness admitted that BBBY provided no update on its repurchase activity or share count between quarterly reporting cycles, and that the updated share count was material non-public information BBBY would not share with investors. BBBY thus did not and, by company policy, would not have disclosed an updated share count to the Cohen Defendants or the market. And the Cohen Defendants' experienced securities counsel, who guided them on these issues, testified that it was not only proper to use the last issuer-

disclosed share count; speculating about an updated share count could result in misleading disclosures. BBBY first disclosed an updated share count at its next quarterly reporting cycle on April 13, 2022, after all the at-issue purchases were complete. That is when the Cohen Defendants became more than 10% holders under Section 16, and it is undisputed there were no matchable transactions thereafter.

The record contains only two disclosures on which Plaintiff's entire case rests, but neither suffices. On January 6, 2022, BBBY disclosed (1) a combined $100 million of capital expenditures and repurchases but did not allocate the spending between the two, and (2) $275 million of *estimated* fourth quarter repurchases that were caveated with forward-looking disclaimers and warnings the estimate would not be updated. That's it. Plaintiff argues the Cohen Defendants should have performed some hypothetical math and assumed they crossed the 10% threshold. No authority imposes a duty to speculate about nonpublic transactions, and the record does not support creating one here. Other BBBY investors with filing obligations unanimously used the last issuer-disclosed share count as of the time of their filing to calculate their percentage ownership, notwithstanding the announced repurchase plan, *and so did BBBY itself*. Plaintiff asks this Court to herald a change in established market practice, ignore the SEC's guidance, and be the first *ever* to impose Section 16(b) strict liability under these circumstances. It should not. The Court should enter summary judgment for the Cohen Defendants.

Even if this Court were to rule that the short-swing profit rule applies, it should still enter summary judgment for the Cohen Defendants. Section 23(a)(1) gives safe harbor to good-faith reliance on SEC regulations. As interpreted by the Second Circuit, it protects the Cohen Defendants because they relied in good faith, through their experienced counsel, on the SEC regulations, as interpreted by the SEC and federal case law at the time of the purchases.

## FACTUAL BACKGROUND

The undisputed material facts, set out in the Cohen Defendants' Statement of Undisputed Material Facts ("SUMF"), are summarized here.

### A. The Parties

Plaintiff was formerly known as "Bed Bath & Beyond Inc." ("BBBY"), a big-box retail chain specializing in home goods, until September 21, 2023, when its name changed to "20230930-DK-Butterfly-1, Inc." as part of the wind-down following its Chapter 11 bankruptcy. SUMF ¶1.

Defendant RC Ventures LLC ("RCV," and together with Defendant Ryan Cohen, the "Cohen Defendants") is a Delaware limited liability company with its principal place of business in Florida. *Id.* ¶2. Mr. Cohen formed RCV to hold his investments; he is its sole owner and Manager. *Id.* ¶3.

### B. Timeline of Relevant Events

#### 1. BBBY announces the expected completion of its share repurchase program by end of fiscal 2021.

In 2020 and 2021, BBBY was executing a $1 billion share repurchase program. *Id.* ¶¶4-6. On November 2, 2021, BBBY announced it was "expect[ing]" to repurchase the remaining $400 million of the program by the end of fiscal 2021, specifically over the third and fourth quarters. *Id.* ¶7. BBBY provided no more detail. To the contrary, BBBY cautioned "[t]he method, timing and actual number of shares repurchased will depend on a variety of factors, including price, general business and market conditions, and alternative investment opportunities." *Id.* ¶¶8-9; *see* Ex. 6 at 34:9-14 [redacted]

BBBY advised the release contained forward-looking statements identified by words like "expect, … estimate, … and similar words and phrases," and "actual results and future financial condition may differ materially … as a result of many factors," such as "uncertainty in financial markets; volatility in the price of the Company's common stock and its effect, and the effect of other factors … on the Company's capital allocation strategy." SUMF ¶10. BBBY cautioned, "[e]xcept as required by law, the Company does not undertake any obligation to update its forward-looking statements." *Id.*

### 2. BBBY discloses its outstanding share count on January 6, 2022.

On January 6, 2022, BBBY filed its Form 10-Q for the third quarter of fiscal 2021, which ended on November 27, 2021. *Id.* ¶¶11-15. In that filing and its accompanying press release and investor presentation, BBBY disclosed it had repurchased approximately $120 million in shares during the third quarter of 2021. *Id.* ¶14. With these repurchases, BBBY updated its outstanding share count to **96,337,713** as of November 27, 2021. *Id.* ¶13.

BBBY's third quarter repurchases left an estimated $275 million in fourth quarter repurchases. *Id.* ¶22. For those repurchases, BBBY's Form 10-Q cautioned that "[t]he Company's share repurchase program could change," and "[a]ny future share repurchases will be subject to the determination of the Board of Directors." *Id.* ¶16. The Form 10-Q did not state how many shares had been repurchased between November 27, 2021 and January 6, 2022. *Id.* ¶14.

The accompanying press release provided no additional clarity. *Id.* ¶¶17-19. BBBY stated it had spent $100 million "in capital expenditures and share repurchase activity" during the quarter-to-date but did not allocate that amount between the two. *Id.* ¶19. And while BBBY stated its expectation to continue repurchasing shares in the fourth quarter, it included the same forward-looking disclaimers described above. *Id.* ¶20.

The investor presentation released alongside these filings similarly provided no clarity. *Id.* ¶¶21-23. Like the press release, it showed BBBY's cash balance as of December 25, 2021 reflected "$0.1B in CapEx and Share Repurchases," a combined figure from which no share count could be derived. *Id.* ¶23. Plaintiff's 30(b)(6) witness confirmed the presentation [redacted] *Id.* ¶25; Ex. 6 at 50:18-51:3. The only other information on repurchases was a graph stating that for Q4 2021 they were "Est." (*i.e.*, estimated) to be $275 million. SUMF ¶22; Ex. 6 at 48:12-22. The presentation also carried the same forward-looking disclaimers. SUMF ¶24.

Accordingly, as of January 6, 2022, the only concrete information in the public domain concerning BBBY's outstanding share count was the November 27, 2021 amount disclosed in its Form 10-Q.

#### 3. The Cohen Defendants purchase BBBY shares between January 13 and March 3, 2022 and rely on advice from experienced counsel to stay under the 10% threshold.

The Cohen Defendants purchased BBBY common stock and call options between January 13 and March 3, 2022. *Id.* ¶26. They were represented in these transactions by Olshan Frome Wolosky LLP, a firm with extensive experience in securities compliance. *Id.* ¶27.

On March 2, 2022, Olshan advised the Cohen Defendants that [redacted] *Id.* ¶28.[1] The Cohen

[1] [redacted]

Defendants acquired a final 20,484 additional shares on March 3, 2022, bringing their total beneficial ownership to 9,450,100 shares; they purchased no shares after that date. *Id.* ¶29.

On March 7, 2022, the Cohen Defendants filed a Schedule 13D reporting their beneficial ownership of 9,450,100 shares, or 9.8% of BBBY's common stock. *Id.* ¶¶30-32. The Schedule 13D disclosed the basis of that calculation: "The aggregate percentage of Shares reported owned by each person named herein is based upon 96,337,713 Shares outstanding as of November 27, 2021 as reported in the Issuer's Quarterly Report on Form 10-Q filed with the Securities and Exchange Commission on January 6, 2022." *Id.* ¶32.

In preparing the Schedule 13D, the Cohen Defendants relied on their counsel, Ryan Nebel of Olshan. *Id.* ¶34. As Mr. Nebel testified, [redacted]

> [redacted]

Ex. 13 at 37:7-23; *accord id.* at 52:23-54:4. And he confirmed he [redacted] *Id.* at 58:23-59:15. He explained that [redacted] *Id.* at 76:6-77:2.

Mr. Nebel's testimony is consistent with Plaintiff's 30(b)(6) witness, who testified [redacted] Ex. 6 at 57:21-25 [redacted] Indeed, Plaintiff's 30(b)(6) witness confirmed during her deposition:

(1) She [redacted]

(2) She [redacted]

(3) [redacted] and

(4) BBBY [redacted]

*Id.* at 29:19-32:9; *see also id.* at 37:24-38:1 [redacted] Nor, as Plaintiff's 30(b)(6) witness testified, [redacted] *Id.* at 36:10-37:2, 38:18-24.

Because BBBY provided none of these updates—and investors could not obtain the information directly from BBBY—the only available information for calculating percentage ownership was the November 27, 2021 share count. In fact, several other sophisticated BBBY shareholders relied on this count just as the Cohen Defendants did to calculate their ownership in February 2022 *after* BBBY's January 6, 2022 disclosure, including BlackRock, Morgan Stanley,

and [redacted] SUMF ¶¶44-47; Ex. 14 ¶¶2-3; Ex. 15 ¶¶2-3; Ex. 16 ¶¶2-3. No BBBY shareholder used a more up-to-date share count because none was available.

The Cohen Defendants were aware of the repurchase program announcement, as reflected in the letter attached to their Schedule 13D. But in that letter, they expressed doubt over whether BBBY could timely execute repurchases alongside its other operational strategies:

> [W]e – and apparently a large portion of the market based on Bed Bath's short interest – doubt the Company can simultaneously buy back shares, cut expenses, invest in its infrastructure and growth, launch new offerings and meet customer demand for core goods. This plan, at least in its present form, does not seem viable.

SUMF ¶33. And it is undisputed they did not know and could not have known about any specific repurchase transactions, timings, or amounts. *Id.*

**4. After the purchases are complete, BBBY represents the Cohen Defendants beneficially owned 9.8% of outstanding shares.**

Following the purchases, BBBY repeatedly recognized the Cohen Defendants' calculation was accurate. On March 7, 2022, BBBY's [redacted] d. *Id.* ¶48. BBBY's [redacted] *Id.* ¶¶49-50. BBBY [redacted] *Id.* ¶¶50-52.

On March 18, 2022, BBBY, [redacted] *Id.* ¶53. And on March 25, 2022, BBBY and the Cohen Defendants issued a joint press release—[redacted]

[redacted]—concerning the Cooperation Agreement in which BBBY again confirmed to the market that the Cohen Defendants were "beneficial owners of approximately 9.8% of the Company's outstanding shares." *Id.* ¶55. On the same day, the Cohen Defendants filed an amended Schedule 13D, prepared by their attorneys at Olshan, to disclose the Cooperation Agreement in which they calculated their beneficial ownership as 9.8%. *Id.* ¶54.

On April 1 and 8, 2022, BBBY [redacted] *Id.* ¶¶56-57. Still, [redacted] *Id.* In response to [redacted] *Id.* ¶57.

**5. BBBY discloses a new outstanding share count on April 13, 2022.**

On April 13, 2022, BBBY announced its fourth quarter results and reported the "[c]ompletion of [its] $1 [b]illion share repurchase program ahead of Fiscal 2023 plans, reflecting $230 million of repurchases in Q4 2021 and $40 million in March 2022." *Id.* ¶58. With these repurchases, BBBY reported an unaudited outstanding share count of 81,979,000 as of February 26, 2022, the first updated share count disclosed to anyone outside the company since January 6, 2022. *Id.* ¶59. BBBY's Form 10-K filed on April 21, 2022 for its fiscal 2021 confirmed the same outstanding share count as of February 26, 2022, and disclosed 79,845,789 shares outstanding as of March 26, 2022. *Id.* ¶64.

Plaintiff's 30(b)(6) witness explained why the program did not proceed as expected: [redacted]

[redacted] *Id.* ¶61. [redacted] *Id.* ¶¶60-63. [redacted] *Id.* ¶¶62-63.

BBBY's subsequent Form 10-Q for the first quarter of fiscal 2022 disclosed a revised outstanding share count of 79,957,649 as of May 28, 2022. *Id.* ¶67. Measured against that count, the Cohen Defendants' 9,450,100 shares represented approximately 11.8% of outstanding shares. *Id.* ¶69.

**6. The Cohen Defendants sell their BBBY shares in August 2022.**

On August 15, 2022, before selling any shares, the Cohen Defendants filed a Form 3 identifying April 21, 2022, the date of BBBY's Form 10-K, as the "Date of Event Requiring Statement." *Id.* ¶68. On August 16, 2022, the Cohen Defendants also filed an amended Schedule 13D to disclose their beneficial ownership of 11.8% of BBBY's outstanding shares based on the May 28, 2022 share count. *Id.* ¶69. [redacted] *Id.* ¶70; Ex. 13 at 107:7-23, 113:7-19.

[redacted]d. SUMF ¶71. [redacted] *Id.* ¶72. Thereafter, on August 16 and 17,

2022, the Cohen Defendants sold all BBBY shares and options purchased between January and March 2022. *Id.* ¶73.

**7. BBBY rejects shareholder demands to bring Section 16(b) claims because the Cohen Defendants were entitled to rely on its January 6, 2022 share count disclosure.**

On August 22 and September 9, 2022, BBBY received demand letters from shareholders requesting the company file a lawsuit or take other action against RCV for allegedly obtaining short-swing profits in violation of Section 16(b). *Id.* ¶¶74-77. Both letters asserted, like here, that RCV was a beneficial owner of more than 10% of outstanding shares by March 1, 2022. *Id.* ¶¶74-77. BBBY, through counsel at Cleary, rejected both demands. *Id.* ¶¶78-81. BBBY informed the shareholders "after thoroughly investigating the transactions," it determined they "do not give rise to liability under Section 16(b)" and therefore "the profits identified … are not recoverable pursuant to Section 16(b)." *Id.* ¶¶79-80. BBBY explained:

(1) RCV "is not subject to Section 16(b)" because it "did not become a beneficial owner of 10% or more of the Company's common stock for the purposes of Section 16(b) until after making the purchases identified in your Letter";

(2) RCV's holdings "after the identified purchases represented 9.8% of the Company's aggregate shares outstanding based on the number of shares outstanding set forth in the Company's most recent quarterly or annual report"; and

(3) RCV was entitled to rely on BBBY's "number of shares outstanding set forth in the [] most recent quarterly or annual report" under Rule 13d-1(j), and nothing in the letters identified "any basis to conclude that RC Ventures knew or had reason to believe that it could not rely on those disclosures at the time of the relevant purchases."

*Id.* Accordingly, BBBY considered the shareholders' "demand[s] that the Company file a lawsuit or take other action to recover the profits earned by RC Ventures under Section 16(b) to be resolved." *Id.* ¶81.

## PROCEDURAL HISTORY

After the shareholders' demands were rejected, they both filed lawsuits against the Cohen Defendants, which were eventually consolidated. *See In re Bed Bath & Beyond Inc. Section 16(b) Litig.*, No. 22-cv-09327 (S.D.N.Y.); *Cohen v. Cohen*, No. 22-cv-09733 (S.D.N.Y.). While these cases were pending, BBBY continually supported dismissal of the claims for the same reasons outlined in its responses to the shareholders. SUMF ¶¶79-80. However, after the bankruptcy court confirmed BBBY's Chapter 11 bankruptcy plan in September 2023, Plaintiff reversed course and attempted to substitute in as plaintiff while the Cohen Defendants' motion to dismiss the consolidated action was pending. *In re Bed Bath & Beyond Inc. Section 16(b) Litig.*, No. 22-cv-09327, ECF 82-85. The court, however, granted the Cohen Defendants' motion to dismiss the consolidated case on the ground that the shareholders' claims were moot, and denied Plaintiff's motion to substitute, finding it "cannot conclude that [Plaintiff] has acted in good faith here." *Id.*, ECF 96 at 11-13.

Plaintiff then commenced this case on August 1, 2024, asserting the same arguments BBBY previously rejected as "not giv[ing] rise to liability under Section 16(b)" and seeking profits that it had admitted "are not recoverable under Section 16(b)." The case was significantly narrowed by the Court's Memorandum and Order of April 18, 2025, which dismissed Plaintiff's theory that the Cohen Defendants are subject to Section 16(b) liability because they were "directors by deputization." ECF 32 at 19-23. Plaintiff's remaining theory is that the Cohen Defendants are subject to Section 16(b) liability as "beneficial owners" of more than 10% of BBBY shares at the time of these purchases and sales because they knew or had reason to believe BBBY's November 27, 2021 share count was inaccurate.

Discovery is now complete, and the Cohen Defendants move for summary judgment.

## LEGAL STANDARD

### A. Summary Judgment

Summary judgment is appropriate where there are no genuine issues of material fact, and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-50 (1986). The moving party has the initial burden of demonstrating the absence of a disputed issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A dispute concerning material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Aldrich v. Randolph Cent. Sch. Dist.*, 963 F.2d 520, 523 (2d Cir. 1992) (quoting *Anderson*, 477 U.S. at 248). Once the moving party carries its initial burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). It must present "*specific facts showing that there is a genuine issue for trial.*" *Beard v. Banks*, 548 U.S. 521, 529 (2006) (quoting Fed. R. Civ. P. 56(e)).

### B. Section 16(b)

Section 16(b) "imposes strict liability on insiders, including officers, directors, and beneficial owners of more than 10% of a company's securities, who realize short-swing profits." *Chechele v. Scheetz*, 819 F. Supp. 2d 342, 345 (S.D.N.Y. 2011), *aff'd*, 466 F. App'x 39 (2d Cir. 2012). Short-swing profits are generated from "the purchase and sale … of a company's stock within a six-month period by persons deemed to be 'insiders.'" *Id.* (cleaned up). Thus, to establish liability under Section 16(b), a plaintiff must prove "that there was (1) a purchase and (2) a sale of securities (3) by [an insider] (4) within a six-month period." *Gwozdzinsky v. Zell/Chilmark Fund, L.P.*, 156 F.3d 305, 308 (2d Cir. 1998). A stockholder who is neither a director nor an officer is an "insider" subject to Section 16(b) only by virtue of beneficial ownership of "more than 10 percent" of a class of the issuer's equity securities.

The Supreme Court has held Section 16(b) should be interpreted strictly so as to "preserve[] its mechanical quality," calling it "a relatively arbitrary rule capable of easy administration." *Reliance Elec. Co. v. Emerson Elec. Co.*, 404 U.S. 418, 422, 425 (1972). To that end, courts are "reluctant to exceed a literal, 'mechanical' application of the statutory text in determining who may be subject to liability." *Olagues v. Perceptive Advisors LLC*, 902 F.3d 121, 126 (2d Cir. 2018) (citing *Gollust v. Mendell*, 501 U.S. 115, 122 (1991)). And they "must assume" that "[i]f Congress wishes to impose such liability ... it will do so expressly or by unmistakable inference," such that Section 16(b) be "carefully confined to its limited areas of clear and unambiguous liability." *Clarus Corp. v. HAP Trading, LLC*, 770 F. Supp. 3d 668, 673 (S.D.N.Y. 2025) (quoting *Foremost-McKesson, Inc. v. Provident Sec. Co.*, 423 U.S. 232, 252 (1976) and *Lewis v. Varnes*, 505 F.2d 785, 788 (2d Cir. 1974)). The "strict liability remedy should be employed cautiously to avoid unfair application." *Olagues*, 902 F.3d at 126. In assessing Section 16(b) liability, courts may rely on the SEC's interpretive guidance as "an agency uniquely experienced in confronting short-swing profiteering." *Roth ex rel. Beacon Power Corp. v. Perseus L.L.C.*, 522 F.3d 242, 249 (2d Cir. 2008) (citation omitted).

## ARGUMENT

Plaintiff's beneficial owner theory turns on a single proposition: that the Cohen Defendants were more than 10% beneficial owners under Rule 13d-1(j) because they knew or had reason to believe BBBY's November 27, 2021 share count was inaccurate. This theory fails as a matter of law. Even if it did not, Section 23(a) would provide safe harbor.

## I. The Cohen Defendants did not beneficially own more than 10% when they bought BBBY stock.

### A. Rule 13d-1(j) permits investors to rely on the issuer's last disclosed share count to determine their beneficial ownership percentage unless they know or have reason to believe it is inaccurate.

Under Section 16(b), an investor is liable for short-swing profits only if the investor was a "beneficial owner" of more than 10% *both* when it purchased and sold the relevant shares. *See* 15 U.S.C. § 78p(b) ("This subsection shall not be construed to cover any transaction where such beneficial owner was not such both at the time of the purchase and sale[.]"). Section 16(b) "does not define the term 'more than 10% beneficial owner.'" *Levy v. Southbrook Int'l Invs., Ltd.*, 263 F.3d 10, 14 (2d Cir. 2001). Instead, as this Court recognized, SEC Rule 16a-1 defines "beneficial owner" to mean "any person who is deemed a beneficial owner pursuant to Section 13(d) of the [Exchange] Act and the rules thereunder." ECF 32 at 15 (quoting 17 C.F.R. § 240.16a-1(a)(1)).

Rule 13d-1(j), promulgated under Section 13(d), governs whether a person is a beneficial owner of more than 10% subject to Section 16(b) liability. ECF 32 at 15; *C.R.A. Realty Corp. v. Enron Corp.*, 842 F. Supp. 88, 91 (S.D.N.Y. 1994) ("The intent of the SEC to define 'ten percent' under Section 16 as it is defined under Section 13(d) could not be clearer."). It permits an investor to rely on an issuer's most recent public disclosure to determine whether it is a "beneficial owner":

> For the purpose of sections 13(d) and 13(g), any person, in determining the amount of outstanding securities of a class of equity securities, *may rely upon information set forth in the issuer's most recent quarterly or annual report*, and any current report subsequent thereto, filed with the Commission pursuant to this Act, *unless he knows or has reason to believe that the information contained therein is inaccurate*.

17 C.F.R. § 240.13d-1(j) (2022) (emphasis added).

The test for determining beneficial ownership is straightforward: an investor is not a "beneficial owner" under Section 16(b) if the investor holds 10% or less of the outstanding shares disclosed in the issuer's most recent SEC filing, so long as they did not know and had no reason

to believe the share count reported in that filing was inaccurate. *Id.* The question on this motion is whether the record could support a finding the Cohen Defendants "kn[ew] or ha[d] reason to believe" the share count "contained" in BBBY's Form 10-Q filed on January 6, 2022 was "inaccurate." It cannot, and no material facts are in dispute.

### B. The Cohen Defendants cannot be deemed more than 10% beneficial owners because they neither knew nor had reason to believe the November 27, 2021 share count was inaccurate.

In deciding the motion to dismiss, the Court found, taking the allegations as true, that the information Plaintiff alleged was publicly available gave rise to a factual issue as to whether the Cohen Defendants knew or had reason to believe the November 27, 2021 share count was inaccurate. The complete discovery record demonstrates that the Cohen Defendants did not know or have reason to believe that share count was inaccurate. That is because: (1) no public disclosure revealed or allowed anyone to calculate the number of shares BBBY repurchased after November 27, 2021; (2) it was impossible for the Cohen Defendants to otherwise obtain information about BBBY's repurchase activity; (3) the Cohen Defendants' awareness of BBBY's estimated and caveated repurchase plans did not provide reason to believe the reported count was inaccurate; and (4) Plaintiff's theory would impose a new, unworkable rule on investors, contrary to precedent requiring Section 16 be applied cautiously to avoid unfairness.

#### 1. No public disclosure revealed or allowed anyone to calculate the number of shares BBBY repurchased after November 27, 2021.

Between the January 6, 2022 Form 10-Q and the Cohen Defendants' final purchase on March 3, 2022, BBBY disclosed no updated share count, no number of shares repurchased, and no figure from which either could be derived. SUMF ¶¶11, 15. The November 2, 2021 press release announced only that BBBY "expect[ed]" to repurchase approximately $400 million by the end of fiscal 2021, subject to cautions that the "method, timing and actual number of shares repurchased"

would vary and actual results may "differ materially." *Id.* ¶¶7-8. The January 6, 2022 Form 10-Q reported approximately $120 million spent on repurchases in the third quarter ending November 27, 2021, and the resulting 96,337,713 share count as of that date, but did not state how many shares had been repurchased *since that date*. *Id.* ¶14.

Neither did the accompanying press release or investor presentation, which both disclosed only a combined $100 million figure for capital expenditures and repurchases quarter-to-date. *Id.* ¶¶18-19, 21-23. Neither disclosure provided a breakdown of how much money was allocated to repurchases or how many shares had been repurchased during that period. *Id.* ¶¶18-19, 21-23. The presentation stated that BBBY estimated $275 million in fourth quarter repurchases but lacked specifics and carried the same cautionary language as the other releases. *Id.* ¶22. BBBY made no further public disclosure about its repurchase program or share count until April 13, 2022. *Id.* ¶60.

Accordingly, BBBY made no public disclosure between January 6 and March 3, 2022—the period during which the Cohen Defendants made their purchases—about its repurchase activity that would have permitted any investor to determine how many shares, if any, had been repurchased since November 27, 2021.

**2. It was impossible for the Cohen Defendants to otherwise obtain information about BBBY's repurchase activity.**

It was impossible for investors like the Cohen Defendants to obtain information about BBBY's repurchase activity between quarters. Plaintiff's Rule 30(b)(6) witness confirmed this, as she testified:

- BBBY [redacted]
- BBBY [redacted]
- [redacted] and

- [redacted]

*Id.* ¶¶39, 42-43. She confirmed that [redacted]. *Id.* ¶¶42-43. [redacted] *Id.* ¶¶62-63.

Her testimony was corroborated by Mr. Nebel, the Cohen Defendants' experienced securities compliance counsel at Olshan, who guided them in these transactions. He explained that, [redacted] *Id.* ¶35. To that end, Mr. Nebel confirmed, consistent with Plaintiff's testimony, [redacted] *Id.* ¶38. [redacted] *Id.* ¶37.

As a result, the only verifiable information available to the Cohen Defendants about BBBY's outstanding share count was the amount reported in its January 6, 2022 Form 10-Q, and it was impossible for the Cohen Defendants to obtain any updated information before the next quarterly filing.

**3. The Cohen Defendants' awareness of BBBY's caveated estimate of planned repurchases did not provide reason to believe the reported count was inaccurate.**

Given this undisputed record, Plaintiff's case reduces to the contention that because the Cohen Defendants were aware BBBY had announced a repurchase program and expected to spend an estimated dollar amount during the quarter, and had spent money on some combination of share repurchases and capital expenditures, they knew or had "reason to believe" the November 27, 2021 count was inaccurate. 17 C.F.R. § 240.13d-1(j). As a matter of law, that is not enough.

As the SEC has recognized, an investor has no "affirmative obligation" under Rule 13d-1(j) "to independently corroborate the accuracy of the number of shares disclosed in an issuer's most recent annual, quarterly or current report." *Modernization of Beneficial Ownership Reporting*, 87 Fed. Reg. 13846, 13856 & n.63 (proposed Mar. 10, 2022) (citing 17 C.F.R. § 240.13d-1(j)). Instead, an investor is entitled to rely on then-available public information and cannot be charged with knowledge that an outstanding share count is inaccurate if it "had no way of knowing" of transactions that changed it, even if aware of the possibility. *C.R.A. Realty*, 842 F. Supp. at 89-91. If it were the other way around, the protections of Rule 13d-1(j) would be a nullity: every periodic report is weeks or months old by the time it is filed, and the outstanding share counts of innumerable public companies change continuously through equity compensation, conversions, offerings, and repurchases.

For almost 20 years, the SEC has published the same interpretive guidance to assist investors in their Section 16 reporting when a repurchase plan has been announced. It states:

> Following a company's buy-back of its stock, a person who previously owned less than 10 percent of the company's stock may own more than 10 percent of the stock without having purchased additional shares. If, before the buy-back, the person is ***aware that the buy-back will occur <u>and</u> will have this result on his or her holdings***, the person should file a Form 3 within 10 days after the buy-back. If the person ***does not have advance awareness of the buy-back <u>and/or</u> its consequences***, he or she would need to determine whether he or she is a more than 10 percent

> beneficial owner and satisfy any obligation to file a Form 3 within ten days after information in the company's most recent quarterly, annual or current report indicates the amount of securities outstanding following the buy-back.

SEC Division of Corporation Finance, Compliance and Disclosure Interpretations, Exchange Act Section 16 and Related Rules and Forms, Interp. 209.02 (May 23, 2007) (emphasis added). Under this SEC guidance, an investor becomes a more than 10% beneficial owner following a stock buyback for Section 16 purposes *only if* the investor has "advance awareness" *both* of a specific buyback transaction (from which the investor could file a Form 3 within 10 days) *and* that the transaction will push the investor over the 10% threshold. If the investor does not have advance awareness of either one, it must wait until the issuer's next quarterly, annual, or current report to calculate its share ownership. Citing this guidance, Romeo & Dye observed, "[p]resumably, an issuer's announcement of a stock repurchase program is not enough to charge a person with knowledge of the precise date on which the issuer later repurchases enough of its outstanding shares to push that person over the ten percent threshold." Peter J. Romeo & Alan L. Dye, S*ection 16 Treatise and Reporting Guide* § 2.03[3][j][iv] n.80 (6th ed. 2024). Thus, under the SEC regulations and guidance, the Cohen Defendants' awareness that BBBY *estimated* spending a certain dollar amount on repurchases, when BBBY cautioned investors about the reliability of that estimate and they had no way to know the truth, is insufficient to give them "reason to believe" the November 27, 2021 share count was inaccurate.

Plaintiff argues that even if BBBY executed a modest fraction of the repurchase plan, it would have been enough to push the Cohen Defendants over the 10% threshold, and all the Cohen Defendants had to do was some hypothetical math to discern that. That argument fails because the Cohen Defendants had no advance awareness of *any* specific repurchase transactions. They would be left to speculate, and no authority requires that. Accordingly, while we recognize the Court

found at the pleading stage Plaintiff alleged "BBBY did far more than announce its share repurchase program," ECF 32 at 17, the undisputed record shows BBBY did not and would not disclose information that would provide "reason to believe" its share count disclosure was inaccurate in a way recognized by Section 16(b) jurisprudence. Nor is there authority that BBBY's disclosure of $100 million in combined, unallocated repurchases and capital expenditures gave investors "reason to believe" its reported share count was inaccurate. To the contrary, in its January 6, 2022 Form 10-Q, BBBY had to disclose its shares outstanding "as of the latest practicable date." U.S. Sec. & Exch. Comm., Form 10-Q, General Instructions at 6, https://www.sec.gov/files/form10-q.pdf. If BBBY could not or would not calculate a more up-to-date figure, how were investors to do so? [redacted] SUMF ¶25. And the conduct of other investors with filing obligations and of BBBY itself, discussed more fully below, corroborates the reasonableness of the Cohen Defendants' reliance on the November 27, 2021 figure.

**4. Plaintiff's theory would impose a new, unworkable rule on investors, contrary to precedent.**

Plaintiff disregards the SEC guidance, case law, and commentary, and asks the Court to adopt a new, unworkable rule: that investors should speculate as to the status of an issuer's announced repurchase plans and substitute their speculation for the count the issuer reported.

Plaintiff's proposed rule would be new. Not only is it contrary to the SEC guidance discussed above; the unanimous market practice when the Cohen Defendants purchased their shares was to rely on the publicly reported share count. BlackRock, Morgan Stanley, and [redacted] all attested they too relied on the November 27, 2021 share count to calculate their beneficial ownership in February 2022, *after* BBBY announced its estimated $275 million outlay. *Id.* ¶¶44-47. And even BBBY, its banker, and its consultants continually recognized the Cohen Defendants'

beneficial ownership calculation based on that share count was correct, including in public statements to the market. *Id.* ¶¶48-55. It was not until April 9, 2022 that [redacted] *Id.* ¶¶56-57. But even then, [redacted] *Id.* ¶¶56-57. Put differently, the Cohen Defendants were "free to engage in transactions in [BBBY's] securities without regard for Section 16 until [BBBY] file[d] a report showing a reduction in the number of shares outstanding sufficient to make the [Cohen Defendants] a ten percent owner." Romeo & Dye, § 2.03[3][j][iv].

On April 13, 2022, BBBY reported an outstanding share count of 81,979,000 as of February 26, 2022, and it was that filing that made the Cohen Defendants beneficial owners of more than 10%. Any transactions that occurred before that filing "are not subject to matching under Section 16(b)." *Id.*; *see In the Matter of Sec. Cap. Rsch. & Mgmt. Inc.*, Exchange Act Release No. 73063, at 4, ¶7 (Sept. 10, 2014) (finding investor crossed 10% threshold as of November 2009 due to issuer repurchases reported in November 6 Form 10-Q).[2] This is the same conclusion BBBY conveyed, through its counsel at Cleary, when it rejected shareholder demands to pursue litigation against the Cohen Defendants. SUMF ¶¶78-81. It was not until after BBBY's bankruptcy plan was confirmed that Plaintiff flip-flopped and advanced this new rule that is contrary to the SEC guidance and unanimous market practices at the time of the Cohen Defendants' purchases.

[2] The SEC found the investor held "beneficial owner" status as of November 2009, after the issuer filed its Form 10-Q on November 6, 2009. The Form 10-Q makes clear that the investor crossed the 10% threshold as of September 30, 2009. Ex. 42 (reporting beneficial ownership of 7,447,865 shares); Ex. 43 at 3 (reporting 63,890,831 shares outstanding September 30, 2009).

Plaintiff's rule would not just be new; it would be unworkable and contrary to precedent. It demands investors speculate as to the status of an issuer's announced repurchase plans and substitute their speculation for the issuer's publicly reported count. But when BBBY finally published repurchase figures on April 21, they revealed a pace that varied nearly threefold from one fiscal month to the next (5.4 million shares, then 2.4 million, then 6.5 million) at prices that moved by nearly 25%. *Id.* ¶¶65-66. No hypothetical math could have reproduced that outcome. And what if BBBY did not repurchase enough (or any) shares to cause the Cohen Defendants to beneficially own more than 10%? Plaintiff would have had the Cohen Defendants file a misleading Schedule 13D on March 7, 2022 that falsely announced ownership of more than 10%, contravening the clarity, predictability, and compliance efficiencies the SEC promotes in its rules. *Ownership Reports & Trading by Officers, Directors & Principal Sec. Holders*, 56 Fed. Reg. 7242, 7242 (Feb. 21, 1991). No authority supports this expansion of Section 16(b)'s narrowly drawn limits.

Precedent requires Section 16(b) to be employed cautiously to avoid unfairness. *Olagues*, 902 F.3d at 126. Indeed, the Second Circuit recently rejected Plaintiff's attempt to stretch Section 16(b)'s limits to punish investors who structured their transactions in BBBY stock to avoid short-swing liability. *See 20230930-DK-Butterfly-1, Inc. v. HBC Investments LLC*, 180 F.4th 490 (2d Cir. 2026). In *HBC Investments*, Plaintiff contended that Hudson Bay's contractual 9.99% blockers should be disregarded because the parties could hypothetically have waived them and because Plaintiff's own arithmetic placed Hudson Bay over the line. *Id.* at 496-97. The court held that beneficial ownership is assessed "by looking to [the] text" of the governing instruments, that a plaintiff must show the mechanism "has in fact failed in practice" rather than "merely speculate" that it might, and that Plaintiff's contrary calculation rested on "dubious math" by calculating Hudson Bay's percentage ownership by including shares it had agreed to sell but still technically

held in contravention of Rule 13d-3(a)(2). *Id.* at 497-98. *HBC Investments* concerned contractual blockers rather than Rule 13d-1(j), but its holding is instructive here: the text of the rule on which the investor relied controls, and a plaintiff's speculation about what the investor hypothetically could have inferred does not displace it.

**C. *C.R.A. Realty* fully applies on this record because the Cohen Defendants had no way of knowing they crossed the 10% threshold.**

Although the Court found *C.R.A. Realty* inapposite at the pleading stage, it is now directly on point as a summary judgment decision. In *C.R.A. Realty*, Goldman Sachs held convertible preferred stock, and its beneficial ownership of that class of stock crossed the 10% threshold on November 29, 1991 because other holders converted their preferred stock into common stock. *C.R.A. Realty*, 842 F. Supp. at 89. There was no dispute that Goldman knew the *possibility* that conversions could increase its beneficial ownership but did not know whether conversions actually occurred because "those numbers were not public." *Id.* Looking "only to the information available at the time of Goldman's actions," the court held that although later filings showed Goldman had in fact held more than 10% on November 29, it was not subject to Section 16(b) because it "had no way of knowing of its ten percent status at that time" and "there was no publicly available information that would have indicated" it had crossed the threshold. *Id.* at 91. To hold otherwise "would be unjust and would not promote the purpose of Section 16(b) to treat Goldman as a company insider, subject to disgorgement, at a time when Goldman was unable to know of that status and behave accordingly." *Id.*

The same is true here. The Cohen Defendants crossed the 10% threshold because BBBY's repurchases had silently reduced its share count. SUMF ¶¶39-43, 60-63. While the Cohen Defendants were aware that BBBY announced an estimated amount of repurchases on January 6, 2022, no subsequent disclosure allowed them to determine whether, or to what extent, those

repurchases actually occurred when they were purchasing BBBY shares. *Id.* ¶¶ 33, 39-43, 60-63. That is because "those numbers were not public." *C.R.A. Realty*, 842 F. Supp. at 89. Accordingly, like Goldman, the Cohen Defendants' awareness that BBBY might repurchase shares in the fourth quarter of fiscal 2021 cannot support a finding that they knew or had reason to believe the November 27, 2021 share count was inaccurate. It "would be unjust and would not promote the purpose of Section 16(b) to treat" the Cohen Defendants as beneficial owners because they were "unable to know of that status and behave accordingly." *Id.* at 91. The holding and reasoning of *C.R.A. Realty* fully apply here and support summary judgment in favor of the Cohen Defendants.

By contrast, *Luxottica*, on which Plaintiff relies, is inapposite on this record. *Luxottica* was a securities fraud case decided on a motion to dismiss, not summary judgment, concerning whether defendants' failure to file a Schedule 13D for almost a year after it exceeded the 5% beneficial ownership threshold violated Section 10(b). *In re Luxottica Grp. S.p.A. Sec. Litig.*, 293 F. Supp. 2d 224 (E.D.N.Y. 2003). There, defendants argued they held less than 5% according to the issuer's most recent *prior* filing, but the court noted that the issuer reported a new share count on *the same day* as their purchases. *Id.* at 235. The court also noted plaintiffs' argument that defendants also had "notice that [the issuer] had an ongoing repurchase program that rendered defendants' failure to file misleading." *Id.* at 235. But the court made no findings on either argument: it held that "[g]iven the factual issue surrounding the parties' dispute, defendants have not demonstrated that, as a matter of law, the failure to file a Schedule 13D regarding their April 19, 2000 purchases, was not in violation of Section 10(b)'s prohibition on false and misleading statements." *Id.* The court did not resolve, on a developed evidentiary record, whether reliance on the reported count was permissible. And because the court dismissed the 10(b) claim with prejudice on other grounds, the factual disputes as they related to the claim were never revisited. *Id.* at 236.

* * *

Plaintiff asks this Court to be the first ever to impose Section 16(b) strict liability on an investor as a "beneficial owner" based on an issuer's announcement that it *estimated* repurchasing stock in the forthcoming quarter. Neither the rules, the cases, the SEC's guidance, nor the record supports a finding that the Cohen Defendants knew or had reason to believe the November 27, 2021 share count was inaccurate.

## II. Even if Section 16(b)'s short-swing profit rule applied, Section 23(a) provides safe harbor for the Cohen Defendants' good-faith conformity with SEC regulations.

This Court should hold that the short-swing profit rule does not apply. But even if it did apply, the Court should still dismiss this case under Section 23(a) of the Exchange Act.

Section 23(a)(1) provides that "[n]o provision of this chapter imposing any liability shall apply to any act done or omitted in good faith in conformity with a rule, regulation, or order of the Commission, … notwithstanding that such rule, regulation, or order may thereafter be amended or rescinded or determined by judicial or other authority to be invalid for any reason." 15 U.S.C. § 78w(a)(1). The Cohen Defendants pleaded this defense, together with Rule 13d-1(j), in their Answer. ECF 40 at 26.

Section 23 protects good-faith conformity with the SEC's rules and their then-existing construction. In *Greene v. Dietz*, the Second Circuit affirmed judgment for defendants because they relied in good faith on Rule 16b-3 before undertaking the challenged transactions. 247 F.2d 689, 694–95 (2d Cir. 1957). Advice from company counsel and an SEC staff response were evidence of that reliance; the court emphasized that the protected reliance was on the rule itself. *Id.* at 695.

The protection also reaches reasonable reliance on the SEC's consistent interpretation of its rule. *Gerstle v. Gamble-Skogmo, Inc.*, 478 F.2d 1281, 1294 (2d Cir. 1973). In *Colema Realty*

*Corp. v. Bibow*, the court found material amendments to an approved option plan lacked required shareholder approval but granted summary judgment under Section 23(a) because defendants acted after receiving advice grounded in existing SEC rulings, and any contrary interpretive guidance post-dated their transactions. 555 F. Supp. 1030, 1032–33, 1040 & n.13 (D. Conn. 1983). These authorities protect conformity with an identifiable regulatory construction, supported by evidence of good-faith reliance.

*C.R.A. Realty* applied Section 23(a)(1) as well, holding that because Rule 13d-1(j) "is relied upon by investors when they make investment decisions," the court must "look only to the information available at the time of [the investor's] actions … consistent with Section 23(a)(1)." *C.R.A. Realty*, 842 F. Supp. at 92. There, "[n]o evidence suggest[ed] that Goldman failed to act in good faith and in conformity with" the rule, so it "was entitled to rely on then-available public information to measure its ownership stake." *Id.*

The good-faith reliance that exculpated defendants in these cases is present here. The calculation was performed by experienced securities counsel under the rule as written and as interpreted by the SEC; it was disclosed, with its basis, in a public filing; the Cohen Defendants stopped purchasing below the threshold their calculation identified; and they purchased nothing after the issuer's subsequent disclosure of a reduced share count. SUMF ¶¶27-38; Cohen Decl. ¶¶2-6; Nebel Decl. ¶¶3-8. The record contains no evidence that the Cohen Defendants believed the November 27, 2021 share count to be inaccurate, and BBBY's own consistent statements confirm BBBY regarded that figure as correct. SUMF ¶¶48-57, 78-81. Because Plaintiff's theory requires a departure from the then-existing construction of Rule 13d-1(j) that the Cohen Defendants relied on, Section 23(a) prohibits liability.

## CONCLUSION

The Court should grant summary judgment dismissing this case in its entirety.

Dated: October 30, 2026

Respectfully submitted,

WOLLMUTH MAHER & DEUTSCH LLP

*/s/ Joshua M. Slocum*
Joshua M. Slocum
Maxwell G. Dillan
Jocelyn M. Stuto
500 Fifth Avenue
New York, New York 10110
Phone: (212) 382-3300
jslocum@wmd-law.com
mdillan@wmd-law.com
jstuto@wmd-law.com

*Attorneys for Defendants Ryan Cohen and RC Ventures LLC*

## WORD COUNT CERTIFICATION

I, Joshua M. Slocum, certify that the foregoing memorandum of law complies with the word-count limitations set forth in Local Civil Rule 7.1(c). According to the word count of the word-processing program used to prepare the memorandum, and exclusive of the portions of it that are excluded by the rule, there are 8,749 words in the document.

Dated: October 30, 2026 *ǀsǀ Joshua M. Slocum*